14-1963(L)

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2015

(Argued: November 18, 2015      Decided: July 20, 2016)

Docket Nos. 14-1963(L), 14-1967, 14-1971, 14-1974,
14-1978, 14-1982, 14-1986, 14-1988, 14-1996, 14-2098

### KIRSCHENBAUM, ET AL. V. 650 FIFTH AVENUE AND RELATED PROPERTIES

JASON KIRSCHENBAUM, ISABELLE KIRSCHENBAUM, on her own behalf and as Executrix of the Estate of Martin Kirschenbaum, JOSHUA KIRSCHENBAUM, DAVID KIRSCHENBAUM, DANIELLE TEITLEBAUM,

*Plaintiffs-Appellees,*

ANNA BEER, HARRY BEER, on his own behalf and as Administrator of the Estate of Alan Beer, ESTELLE CARROLL, PHYLLIS MAISEL,

*Plaintiffs-Appellees,*

STEVEN M. GREENBAUM, in his personal capacity and as administrator of the Estate of Judith (Shoshana) Lillian Greenbaum, ALAN HAYMAN, SHIRLEE HAYMAN,

*Plaintiffs-Appellees,*

CARLOS ACOSTA, MARIA ACOSTA, TOVA ETTINGER, IRVING FRANKLIN, in his personal capacity and as personal representative of the estate of Irma Franklin, BARUCH KAHANE, LIBBY KAHANE, in her personal capacity and as Administratrix

of the Estate of Meir Kahane, ETHEL J. GRIFFIN, as Public Administrator of the County of New York and Administratrix of the Estate of Binyamin Kahane, NORMAN KAHANE, in his personal capacity and as Executor of the Estate of Sonia Kahane, CIPORAH KAPLAN,

*Plaintiffs-Appellees,*

EDWENA R. HEGNA, Executrix of the Estate of Charles Hegna, STEVEN A. HEGNA, LYNN MARIE HEGNA MOORE, CRAIG M. HEGNA, PAUL B. HEGNA,

*Plaintiffs-Appellees,*

TERRY ABBOTT, JOHN ROBERT ALLMAN, RONNY KENT BATES, JAMES BAYNARD, JESS W. BEAMON, ALVIN BURTON BELMER, RICHARD D. BLANKENSHIP, JOHN W. BLOCKER, JOSEPH JOHN BOCCIA JR., LEON BOHANNON, JOHN BONK JR., JEFFREY JOSEPH BOULOS, JOHN NORMAN BOYETT, WILLIAM BURLEY, PAUL CALLAHAN, MECOT CAMARA, BRADLEY CAMPUS, JOHNNIE CEASAR, ROBERT ALLEN CONLEY, CHARLES DENNIS COOK, JOHNNY LEN COPELAND, DAVID COSNER, KEVIN COULMAN, RICK CRUDALE, RUSSELL CYZICK, MICHAEL DEVLIN, NATHANIEL DORSEY, TIMOTHY DUNNIGAN, BRYAN EARLE, DANNY R. ESTES, RICHARD ANDREW FLUEGEL, MICHAEL D. FULCHER, SEAN GALLAGHER, GEORGE GANGUR, RANDALL GARCIA, HAROLD GHUMM, TIMOTHY GIBLIN, MICHAEL GORCHINSKI, RICHARD GORDON, DAVIN M. GREEN, THOMAS HAIRSTON, MICHAEL HASKELL, MARK ANTHONY HELMS, STANLEY G. HESTER, DONALD WAYNE HILDRETH, RICHARD HOLBERTON, DR. JOHN HUDSON, MAURICE EDWARD HUKILL, EDWARD IACOVINO JR., PAUL INNOCENZI III, JAMES JACKOWSKI, JEFFREY WILBUR JAMES, NATHANIEL WALTER JENKINS, EDWARD ANTHONY JOHNSTON, STEVEN JONES, THOMAS ADRIAN JULIAN, THOMAS KEOWN, DANIEL KLUCK, JAMES C. KNIPPLE, FREAS H. KREISCHER III, KEITH LAISE, JAMES LANGON IV, MICHAEL SCOTT LARIVIERE, STEVEN LARIVIERE, RICHARD LEMNAH, JOSEPH R. ("JOEL") LIVINGSTON III, PAUL D. LYON JR., JOHN MACROGLOU, SAMUEL MAITLAND JR., CHARLIE ROBERT MARTIN, DAVID MASSA, JOHN MCCALL, JAMES E. MCDONOUGH, TIMOTHY R. MCMAHON, RICHARD MENKINS II, RONALD MEURER, JOSEPH PETER MILANO, JOSEPH MOORE, HARRY DOUGLAS MYERS, DAVID NAIRN, JOHN ARNE OLSON, JOSEPH ALBERT OWENS, CONNIE RAY PAGE, ULYSSES GREGORY PARKER, JOHN L. PEARSON, THOMAS S. PERRON, JOHN ARTHUR PHILLIPS JR., WILLIAM ROY POLLARD, VICTOR MARK

PREVATT, JAMES PRICE, PATRICK KERRY PRINDEVILLE, DIOMEDES J. QUIRANTE, WARREN RICHARDSON, LOUIS J. ROTONDO, MICHAEL CALEB SAULS, CHARLES JEFFREY SCHNORF, SCOTT LEE SCHULTZ, PETER SCIALABBA, GARY RANDALL SCOTT, THOMAS ALAN SHIPP, JERRYL SHROPSHIRE, LARRY H. SIMPSON JR., KIRK HALL SMITH, THOMAS GERARD SMITH, VINCENT SMITH, WILLIAM SCOTT SOMMERHOF, STEPHEN EUGENE SPENCER, WILLIAM STELPFLUG, HORACE RENARDO ("RICKY") STEPHENS JR., CRAIG STOCKTON, JEFFREY STOKES, ERIC D. STURGHILL, DEVON SUNDAR, THOMAS PAUL THORSTAD, STEPHEN TINGLEY, DONALD H. VALLONE JR., ERIC GLENN WASHINGTON, DWAYNE WIGGLESWORTH, RODNEY J. WILLIAMS, SCIPIO WILLIAMS JR., JOHNNY ADAM WILLIAMSON, WILLIAM ELLIS WINTER, DONALD ELBERAN WOOLLETT, CRAIG WYCHE, JEFFREY D. YOUNG, MARVIN ALBRIGHT, PABLO ARROYO, ANTHONY BANKS, RODNEY DARRELL BURNETTE, FRANK COMES JR., GLENN DOLPHIN, FREDERICK DANIEL EAVES, CHARLES FRYE, TRUMAN DALE GARNER, LARRY GERLACH, JOHN HLYWIAK, ORVAL HUNT, JOSEPH P. JACOBS, BRIAN KIRKPATRICK, BURNHAM MATTHEWS, TIMOTHY MITCHELL, LOVELLE "DARRELL" MOORE, JEFFREY NASHTON, JOHN OLIVER, PAUL RIVERS, STEPHEN RUSSELL, DANA SPAULDING, CRAIG JOSEPH SWINSON, MICHAEL TOMA, DANNY WHEELER, THOMAS D. YOUNG, LILLA WOOLLETT ABBEY, JAMES ABBOTT, MARY ABBOTT (ESTATE OF), ELIZABETH ADAMS, EILEEN PRINDEVILLE AHLQUIST, MIRALDA (JUDITH MAITLAND) ALARCON, ANNE ALLMAN, ROBERT ALLMAN, THEODORE ALLMAN (ESTATE OF), DIANNE MARGARET ("MAGGIE") ALLMAN, MARGARET E. ALVAREZ, KIMBERLY F. ANGUS, DONNIE BATES, JOHNNY BATES, LAURA BATES, MARGIE BATES, MONTY BATES, THOMAS BATES JR., THOMAS C. BATES SR., MARY E. BAUMGARTNER, ANTHONY BAYNARD, BARRY BAYNARD, EMERSON BAYNARD, PHILIP BAYNARD, THOMASINE BAYNARD, TIMOTHY BAYNARD, WAYNE BAYNARD, STEPHEN BAYNARD, ANNA BEARD, MARY ANN BECK, ALUE BELMER, ANNETTE BELMER, CLARENCE BELMER, COLBY KEITH BELMER, DENISE BELMER, DONNA BELMER, FAYE BELMER, KENNETH BELMER, LUDDIE BELMER, SHAWN BIELLOW, MARY FRANCES BLACK, DONALD BLANKENSHIP JR., DONALD BLANKENSHIP SR., MARY BLANKENSHIP (ESTATE OF), ALICE BLOCKER, DOUGLAS BLOCKER, JOHN R. BLOCKER, ROBERT BLOCKER, JAMES BOCCIA, JOSEPH BOCCIA SR., PATRICIA BOCCIA, RAYMOND BOCCIA, RICHARD BOCCIA, RONNIE (VERONICA) BOCCIA, LETICIA BODDIE, ANGELA BOHANNON, ANTHONY BOHANNON, CARRIE BOHANNON, DAVID BOHANNON, EDNA BOHANNON, LEON BOHANNON SR., RICKI BOHANNON, BILLIE JEAN BOLINGER, JOSEPH BOULOS, LYDIA BOULOS, MARIE BOULOS, REBECCA BOWLER, LAVON BOYETT, NORMAN E. BOYETT JR. (ESTATE OF), THERESA U. ROTH BOYETT,

3

WILLIAM A. BOYETT, SUSAN SCHNORF BREEDEN, DAMION BRISCOE, CHRISTINE BROWN, ROSANNE BRUNETTE, MARY LYNN BUCKNER, CLAUDE BURLEY (ESTATE OF), WILLIAM DOUGLAS BURLEY (ESTATE OF), MYRA BURLEY, KATHLEEN CALABRO, RACHEL CALDERA, AVENELL CALLAHAN, MICHAEL CALLAHAN, PATRICIA (PATSY ANN) CALLOWAY, ELISA ROCK CAMARA, THERESA RIGGS CAMARA, CANDACE CAMPBELL, CLARE CAMPUS, ELAINE CAPOBIANCO, FLORENE MARTIN CARTER, PHYLLIS A. CASH, THERESA CATANO, BRUCE CEASAR, FRANKLIN CEASAR, FREDRICK CEASAR, ROBBIE NELL CEASAR, SYBIL CEASAR, CHRISTINE DEVLIN CECCA, TAMMY CHAPMAN, JAMES CHERRY, SONIA CHERRY, ADELE H. CHIOS, JANA M. CHRISTIAN, SHARON ROSE CHRISTIAN, SUSAN CIUPASKA, LeSHUNE STOKES CLARK, ROSEMARY CLARK, MARY ANN COBBLE, KAREN SHIPP COLLARD, JENNIFER COLLIER, MELIA WINTER COLLIER, DEBORAH M. COLTRANE, JAMES N. CONLEY JR., ROBERTA LI CONLEY, CHARLES F. COOK, ELIZABETH A. COOK, MARY A. COOK (ESTATE OF), ALAN TRACY COPELAND, BETTY COPELAND, DONALD COPELAND, BLANCHE CORRY, HAROLD COSNER, JEFFREY COSNER, LEANNA COSNER, MARVA LYNN COSNER (ESTATE OF), CHERYL COSSABOOM, BRYAN THOMAS COULMAN, CHRISTOPHER J. COULMAN, DENNIS P. COULMAN, LORRAINE M. COULMAN, ROBERT D. COULMAN, ROBERT LOUIS COULMAN, CHARLITA MARTIN COVINGTON, AMANDA CROUCH, MARIE CRUDALE, EUGENE CYZICK, LYNN DALLACHIE, ANNE DEAL, LYNN SMITH DERBYSHIRE, THERESA DESJARDINS, CHRISTINE DEVLIN, DANIEL DEVLIN, GABRIELLE (COLLEEN) DEVLIN, RICHARD DEVLIN, SEAN DEVLIN, ROSALIE DONAHUE (MILANO), ASHLEY DORAY, REBECCA DOSS, CHESTER DUNNIGAN, ELIZABETH ANN DUNNIGAN, MICHAEL DUNNIGAN, WILLIAM DUNNIGAN, CLAUDINE DUNNIGAN, JANICE THORSTAD EDQUIST, MARY RUTH ERVIN, BARBARA ESTES, CHARLES ESTES, FRANK ESTES, LORI FANSLER, ANGELA DAWN FARTHING, ARLINGTON FERGUSON, HILTON FERGUSON, LINDA SANDBACK FISH, NANCY BROCKSBANK FOX, TIA FOX, TAMMY FRESHOUR, RUBY FULCHER, BARBARA GALLAGHER, BRIAN GALLAGHER, JAMES GALLAGHER (ESTATE OF), JAMES GALLAGHER JR., KEVIN GALLAGHER, MICHAEL GALLAGHER, DIMITRI GANGUR, MARY GANGUR, JESS GARCIA, RONALD GARCIA, ROXANNE GARCIA, RUSSELL GARCIA, VIOLET GARCIA, SUZANNE PERRON GARZA, JEANNE GATTEGNO, ARLENE GHUMM, ASHLEY GHUMM, BILL GHUMM, EDWARD GHUMM, HILDEGARD GHUMM, JEDAIAH GHUMM (ESTATE OF), JESSE GHUMM, LEROY GHUMM, MORONICA GHUMM, DONALD GIBLIN, JEANNE GIBLIN, MICHAEL GIBLIN, TIFFANY GIBLIN, VALERIE GIBLIN, WILLIAM GIBLIN, THAD GILFORD-SMITH, REBECCA GINTONIO, DAWN GOFF, CHRISTINA GORCHINSKI, JUDY GORCHINSKI, KEVIN GORCHINSKI, VALERIE GORCHINSKI, ALICE GORDON, JOSEPH GORDON, LINDA

4

GORDON, NORRIS GORDON (ESTATE OF), PAUL GORDON, ANDREA GRANT, DEBORAH GRAVES, DEBORAH GREEN, LIBERTY QUIRANTE GREGG, ALEX GRIFFIN, CATHERINE E. GRIMSLEY, MEGAN GUMMER, LYDA WOOLLETT GUZ, DARLENE HAIRSTON, TARA HANRAHAN, MARY CLYDE HART, BRENDA HASKILL, JEFFREY HASKELL, KATHLEEN S. HEDGE, CHRISTOPHER TODD HELMS, MARVIN R. HELMS, DORIS HESTER, CLIFTON HILDRETH, JULIA HILDRETH, MARY ANN HILDRETH, MICHAEL WAYNE HILDRETH, SHARON A. HILTON, DONALD HOLBERTON, PATRICIA LEE HOLBERTON, THOMAS HOLBERTON, TANGIE HOLLIFIELD, DEBRA HORNER, ELIZABETH HOUSE, JOYCE A. HOUSTON, TAMMY CAMARA HOWELL, LISA H. HUDSON, LORENZO HUDSON, LUCY HUDSON, RUTH HUDSON, SAMUEL HUDSON (ESTATE OF), WILLIAM J. HUDSON, SUSAN THORSTAD HUGIS (ESTATE OF), NANCY TINGLEY HURLBURT, CYNTHIA PERRON HURSTON, EDWARD IACOVINO SR. (ESTATE OF), ELIZABETH IACOVINO, DEBORAH INNOCENZI, KRISTIN INNOCENZI, MARK INNOCENZI, PAUL INNOCENZI IV, BERNADETTE JACCOM, JOHN JACKOWSKI JR., JOHN JACKOWSKI SR.,VICTORIA JACOBUS, ELAINE JAMES, NATHALIE C. JENKINS, STEPHEN JENKINS, REBECCA JEWETT, LINDA MARTIN JOHNSON, RAY JOHNSON, RENNITTA STOKES JOHNSON, SHERRY JOHNSON, CHARLES JOHNSTON, EDWIN JOHNSTON, MARY ANN JOHNSTON, ZANDRA LARIVIERE JOHNSTON, ALICIA JONES, CORENE MARTIN JONES, KIA BRISCOE JONES, MARK JONES, OLLIE JONES, SANDRA D. JONES, SYNOVURE JONES (ESTATE OF), ROBIN COPELAND JORDAN, SUSAN SCOTT JORDAN, JOYCE JULIAN, KARL JULIAN, NADA JURIST, ADAM KEOWN, BOBBY KEOWN JR., BOBBY KEOWN SR., DARREN KEOWN, WILLIAM KEOWN, MARY JOE KIRKER, KELLY KLUCK, MICHAEL KLUCK, JOHN D. KNIPPLE (ESTATE OF), JOHN R. KNIPPLE, PAULINE KNIPPLE (ESTATE OF), SHIRLEY L. KNOX, DOREEN KREISCHER, FREAS H. KREISCHER JR., CYNTHIA D. LAKE, WENDY L. LANGE, JAMES LANGON III, EUGENE LARIVIERE, JANET LARIVIERE, JOHN M. LARIVIERE, LESLEY LARIVIERE, MICHAEL LARIVIERE, NANCY LARIVIERE, RICHARD LARIVIERE, RICHARD G. LARIVIERE (ESTATE OF), ROBERT LARIVIERE, WILLIAM LARIVIERE, CATHY L. LAWTON, HEIDI CRUDALE LEGAULT, CLARENCE LEMNAH (ESTATE OF), ETTA LEMNAH, FAY LEMNAH, HAROLD LEMNAH, MARLYS LEMNAH, ROBERT LEMNAH, RONALD LEMNAH, ANNETTE R. LIVINGSTON, JOSEPH R. LIVINGSTON IV, JOSEPH R. LIVINGSTON JR. (ESTATE OF), ROBIN M. LYNCH, EARL LYON, FRANCISCO LYON, JUNE LYON, MARIA LYON, PAUL D. LYON SR., VALERIE LYON, HEATHER MACROGLOU, KATHLEEN DEVLIN MAHONEY, KENTY MAITLAND, LEYSNAL MAITLAND, SAMUEL MAITLAND SR., SHIRLA MAITLAND, VIRGINIA BOCCIA MARSHALL, JOHN MARTIN, PACITA MARTIN, RENERIO MARTIN, RUBY MARTIN, SHIRLEY MARTIN, MARY MASON, CRISTINA MASSA, EDMUND MASSA, JOAO

5

("JOHN") MASSA, JOSE ("JOE") MASSA, MANUEL MASSA JR., RAMIRO MASSA, MARY MCCALL, THOMAS MCCALL (ESTATE OF), VALERIE MCCALL, GAIL MCDERMOTT, JULIA A. MCFARLIN, GEORGE MCMAHON, MICHAEL MCMAHON, PATTY MCPHEE, DARREN MENKINS, GREGORY MENKINS, MARGARET MENKINS, RICHARD H. MENKINS, JAY T. MEURER, JOHN MEURER, JOHN THOMAS MEURER, MARY LOU MEURER, MICHAEL MEURER, PENNY MEYER, ANGELA MILANO, PETER MILANO JR., EARLINE MILLER, HENRY MILLER, PATRICIA MILLER, HELEN MONTGOMERY, BETTY MOORE, HARRY MOORE, KIMBERLY MOORE, MARY MOORE, MELISSA LEA MOORE, MICHAEL MOORE (ESTATE OF), ELIZABETH PHILLIPS MOY, DEBRA MYERS, GENEVA MYERS, HARRY A. MYERS, BILLIE ANN NAIRN, CAMPBELL J. NAIRN III, CAMPBELL J. NAIRN JR. (ESTATE OF), WILLIAM P. NAIRN, RICHARD NORFLEET, DEBORAH O'CONNOR, PEARL OLANIJI, BERTHA OLSON (ESTATE OF), KAREN L. OLSON, RANDAL D. OLSON, ROGER S. OLSON, RONALD J. OLSON, SIGURD OLSON (ESTATE OF), DAVID OWENS, DEANNA OWENS, FRANCES OWENS, JAMES OWENS (ESTATE OF), STEVEN OWENS, CONNIE MACK PAGE, JUDITH K. PAGE, LISA MENKINS PALMER, GERALDINE PAOLOZZI, MAUREEN PARE, HENRY JAMES PARKER, SHARON PARKER, HELEN M. PEARSON, JOHN L. PEARSON JR., SONIA PEARSON, BRETT PERRON, DEBORAH JEAN PERRON, MICHELLE PERRON, RONALD R. PERRON, MURIEL PERSKY, DEBORAH D. PETERSON, SHARON CONLEY PETRY, SANDRA PETRICK, DONNA VALLONE PHELPS, HAROLD PHILLIPS, JOHN ARTHUR PHILLIPS SR., DONNA TINGLEY PLICKYS, MARGARET AILEEN POLLARD, STACEY YVONNE POLLARD, LEE HOLLAN PREVATT, VICTOR THORNTON PREVATT, JOHN PRICE, JOSEPH PRICE, BARBARA D. PRINDEVILLE (ESTATE OF), KATHLEEN TARA PRINDEVILLE, MICHAEL PRINDEVILLE, PAUL PRINDEVILLE, SEAN PRINDEVILLE, BELINDA J. QUIRANTE, EDGAR QUIRANTE, GODOFREDO QUIRANTE (ESTATE OF), MILTON QUIRANTE, SABRINA QUIRANTE, SUSAN RAY, LAURA M. REININGER, ALAN RICHARDSON, BEATRICE RICHARDSON, CLARENCE RICHARDSON, ERIC RICHARDSON, LYNETTE RICHARDSON, VANESSA RICHARDSON, PHILIECE RICHARDSON-MILLS, MELROSE RICKS, BELINDA QUIRANTE RIVA, BARBARA ROCKWELL, LINDA ROONEY, TARA SMITH ROSE, TAMMI RUARK, JULIANA RUDKOWSKI, MARIE MCMAHON RUSSELL, ALICIA LYNN SANCHEZ, ANDREW SAULS, HENRY CALEB SAULS, RILEY A. SAULS, MARGARET MEDLER SCHNORF, RICHARD SCHNORF, RICHARD SCHNORF, ROBERT SCHNORF, BEVERLY SCHULTZ, DENNIS JAMES SCHULTZ, DENNIS RAY SCHULTZ, FRANK SCIALABBA, JACQUELINE SCIALABBA, SAMUEL SCOTT SCIALABBA, JON CHRISTOPHER SCOTT, KEVIN JAMES SCOTT, LARRY L. SCOTT (ESTATE OF), MARY ANN SCOTT, SHERIA SCOTT, STEPHEN ALLEN SCOTT, JACKLYN SEGUERRA, BRYAN RICHARD SHIPP, JAMES

6

DAVID SHIPP, JANICE SHIPP, MAURICE SHIPP, PAULINE SHIPP, RAYMOND DENNIS SHIPP, RUSSELL SHIPP, SUSAN J. SINSIOCO, ANA SMITH-WARD, ANGELA JOSEPHINE SMITH (ESTATE OF), BOBBIE ANN SMITH, CYNTHIA SMITH, DONNA MARIE SMITH, ERMA SMITH, HOLLY SMITH, IAN SMITH, JANET SMITH, JOSEPH K. SMITH III, JOSEPH K. SMITH JR., KEITH SMITH, KELLY B. SMITH, SHIRLEY L. SMITH, TADGH SMITH, TERRENCE SMITH, TIMOTHY B. SMITH, JOCELYN J. SOMMERHOF, JOHN SOMMERHOF, WILLIAM J. SOMMERHOF, DOUGLAS SPENCER, CHRISTY WILLIFORD STELPFLUG, JOSEPH STELPFLUG, KATHY NATHAN STELPFLUG, LAURA BARFIELD STELPFLUG, PEGGY STELPFLUG, WILLIAM STELPFLUG, HORACE STEPHENS SR., JOYCE STEPHENS, KEITH STEPHENS, DONA STOCKTON, DONALD STOCKTON (ESTATE OF), RICHARD STOCKTON, IRENE STOKES, NELSON STOKES JR., NELSON STOKES SR. (ESTATE OF), ROBERT STOKES, GWENN STOKES-GRAHAM, MARCUS D. STURGHILL, MARCUS L. STURGHILL JR., NAKEISHA LYNN STURGHILL, DOREEN SUNDAR, MARGARET TELLA, SUSAN L. TERLSON, MARY ELLEN THOMPSON, ADAM THORSTAD, BARBARA THORSTAD, JAMES THORSTAD JR., JAMES THORSTAD SR., JOHN THORSTAD, RYAN THORSTAD, BETTY ANN THURMAN, BARBARA TINGLEY, RICHARD L. TINGLEY, RUSSELL TINGLEY, KEYSHA TOLLIVER, MARY ANN TUREK, KAREN VALENTI, ANTHONY VALLONE, DONALD H. VALLONE, TIMOTHY VALLONE, LEONA MAE VARGAS, DENISE VOYLES, ILA WALLACE, KATHRYN THORSTAD WALLACE, RICHARD J. WALLACE, BARBARA THORSTAD WARWICK, LINDA WASHINGTON, VANCINE WASHINGTON, KENNETH WATSON, DIANE WHITENER, DARYL WIGGLESWORTH, DARRIN A. WIGGLESWORTH, HENRY WIGGLESWORTH, MARK WIGGLESWORTH, ROBYN WIGGLESWORTH, SANDRA WIGGLESWORTH, SHAWN WIGGLESWORTH, DIANNE STOKES WILLIAMS, GUSSIE MARTIN WILLIAMS, JANET WILLIAMS, JOHNNY WILLIAMS, RHONDA WILLIAMS, RONALD WILLIAMS, RUTH WILLIAMS, SCIPIO J. WILLIAMS, WESLEY WILLIAMS, DELMA WILLIAMS-EDWARDS, TONY WILLIAMSON, JEWELENE WILLIAMSON, MICHAEL WINTER, BARBARA WISEMAN, PHYLLIS WOODFORD, JOYCE WOODLE, BEVERLY WOOLLETT, PAUL WOOLLETT, MELVINA STOKES WRIGHT, PATRICIA WRIGHT, GLENN WYCHE, JOHN WYCHE, JOHN F. YOUNG, JOHN W. YOUNG, JUDITH CAROL YOUNG, SANDRA RHODES YOUNG, JOANNE ZIMMERMAN, STEPHEN THOMAS ZONE, PATRICIA THORSTAD ZOSSO, JAMAAL MUATA ALI, MARGARET ANGELONI, JESUS ARROYO, MILAGROS ARROYO, OLYMPIA CARLETTA, KIMBERLY CARPENTER, JOAN COMES, PATRICK COMES, CHRISTOPHER COMES, FRANK COMES SR., DEBORAH CRAWFORD, BARBARA DAVIS, ALICE WARREN FRANKLIN, PATRICIA GERLACH, TRAVIS GERLACH, MEGAN GERLACH, ARMINDA HERNANDEZ, MARGARET HLYWIAK, PETER HLYWIAK JR., PETER HLYWIAK SR., PAUL

HLYWIAK, JOSEPH HLYWIAK, CYNTHIA LOU HUNT, ROSA IBARRO, ANDREW SCOTT JACOBS, DANIEL JOSEPH JACOBS, DANITA JACOBS, KATHLEEN KIRKPATRICK, GRACE LEWIS, LISA MAGNOTTI, WENDY MITCHELL, JAMES OTIS MOORE (ESTATE OF), JOHNNEY S. MOORE (ESTATE OF), MARVIN S. MOORE, ALIE MAE MOORE, JONNIE MAE MOORE-JONES, ALEX W. NASHTON (ESTATE OF), PAUL OLIVER, RILEY OLIVER, MICHAEL JOHN OLIVER, ASHLEY E. OLIVER, PATRICK S. OLIVER, KAYLEY OLIVER, TANYA RUSSELL, WANDA RUSSELL, JASON RUSSELL, CLYDIA SHAVER, SCOTT SPAULDING, CECILIA STANLEY, MARY STILPEN, KELLY SWANK, KENNETH J. SWINSON (ESTATE OF), INGRID M. SWINSON (ESTATE OF), DANIEL SWINSON, WILLIAM SWINSON, DAWN SWINSON, TERESA SWINSON, BRONZELL WARREN, JESSICA WATSON, AUDREY WEBB, JONATHAN WHEELER, BENJAMIN WHEELER, MARLIS "MOLLY" WHEELER (ESTATE OF), KERRY WHEELER, ANDREW WHEELER, BRENDA JUNE WHEELER, JILL WOLD, NORA YOUNG (ESTATE OF), JAMES YOUNG, ROBERT YOUNG (ESTATE OF),

*Plaintiffs-Appellees*,

THE ESTATE OF MICHAEL HEISER, GARY HEISER, FRANCIS HEISER, THE ESTATE OF LELAND TIMOTHY HAUN, IBIS S. HAUN, MILAGRITOS PEREZ-DALIS, SENATOR HAUN, THE ESTATE OF JUSTIN R. WOOD, RICHARD W. WOOD, KATHLEEN M. WOOD, SHAWN M. WOOD, THE ESTATE OF EARL F. CARTRETTE JR., DENISE M. EICHSTAEDT, ANTHONY W. CARTRETTE, LEWIS W. CARTRETTE, THE ESTATE OF BRIAN MCVEIGH, SANDRA M. WETMORE, JAMES V. WETMORE, THE ESTATE OF MILLARD D. CAMPBELL, MARIE R. CAMPBELL, BESSIE A. CAMPBELL, THE ESTATE OF KEVIN J. JOHNSON, SHYRL L. JOHNSON, CHE G. COLSON, KEVIN JOHNSON JR., NICHOLAS A. JOHNSON, LAURA E. JOHNSON, BRUCE JOHNSON, THE ESTATE OF JOSEPH E. RIMKUS, BRIDGET BROOKS, JAMES R. RIMKUS, ANNE M. RIMKUS, THE ESTATE OF BRENT E. MARTHALER, KATIE L. MARTHALER, SHARON MARTHALER, HERMAN C. MARTHALER III, MATHEW MARTHALER, KIRK MARTHALER, THE ESTATE OF THANH VAN NGUYEN, CHRISTOPHER R. NGUYEN, THE ESTATE OF JOSHUA E. WOODY, DAWN WOODY, BERNADINE R. BEEKMAN, GEORGE M. BEEKMAN, TRACY M. SMITH, JONICA L. WOODY, TIMOTHY WOODY, THE ESTATE OF PETER J. MORGERA, MICHAEL MORGERA, THOMAS MORGERA, THE ESTATE OF KENDALL KITSON JR., NANCY R. KITSON, KENDALL K. KITSON, STEVE K. KITSON, NANCY A. KITSON, THE ESTATE OF CHRISTOPHER ADAMS, CATHERINE ADAMS, JOHN E. ADAMS, PATRICK D. ADAMS, MICHAEL T. ADAMS, DANIEL ADAMS, MARY YOUNG, ELIZABETH WOLF, WILLIAM

ADAMS, THE ESTATE OF CHRISTOPHER LESTER, CECIL H. LESTER JR., JUDY LESTER, CECIL H. LESTER JR., JESSICA F. LESTER, THE ESTATE OF JEREMY A. TAYLOR, LAWRENCE E. TAYLOR, VICKI L. TAYLOR, STARLINA D. TAYLOR, THE ESTATE OF PATRICK P. FENNIG, THADDEUS C. FENNIG, CATHERINE FENNIG, PAUL D. FENING, MARK FENING,

*Plaintiffs-Appellees*,

FIONA HAVLISH, individually and on behalf of the Estate of Donald J. Havlish Jr., DONALD HAVLISH SR., SUSAN CONKLIN, WILLIAM HAVLISH, TARA BANE, individually and on behalf of the Estate of Michael A. Bane, DONALD BANE, CHRISTINA BANE-HAYES, KRYSTYNA BORYCZEWSKI, individually and on behalf of the Estate of Martin Boryczewski, ESTATE OF MICHAEL BORYCZEWSKI, JULIA BORYCZEWSKI, MICHELE BORYCZEWSKI, GRACE KNESKI, individually and on behalf of the Estate of Steven Cafiero, RICHARD A. CAPRONI, individually and on behalf of the Estate of Richard M. Caproni, DOLORES CAPRONI, CHRISTOPHER CAPRONI, MICHAEL CAPRONI, LISA CAPRONI-BROWN, CLARA CHIRCHIRILLO, individually and on behalf of the Estate of Peter Chirchirillo, LIVIA CHIRCHIRILLO, CATHERINE DEBLIECK, WILLIAM COALE, individually and on behalf of the Estate of Jeffrey Coale, FRANCES COFFEY, individually and on behalf of the Estates of Daniel M. Coffey and Jason Coffey, DANIEL D. COFFEY, M.D., KEVIN M. COFFEY, THE ESTATE OF JEFFREY COLLMAN, DWAYNE W. COLLMAN, BRIAN COLLMAN, CHARLES COLLMAN, BRENDA SORENSON, LOISANNE DIEHL, individually and on behalf of the Estate of Michael Diehl, MORRIS DORF, individually and on behalf of the Estate of Stephen Dorf, MICHELLE DORF, ANNE MARIE DORF, ROBERT DORF, JOSEPH DORF, LINDA SAMMUT, CORAZON FERNANDEZ, individually and on behalf of the Estate of Judy Fernandez, MARIA REGINA MERWIN, individually and on behalf of the Estate of Ronald Gamboa, GRACE PARKINSON-GODSHALK, individually and on behalf of the Estate of William R. Godshalk, TINA GRAZIOSO, individually and on behalf of the Estate of John Grazioso, JIN LIU, individually and on behalf of the Estate of Liming Gu, ALAN GU, MAUREEN HALVORSON, individually and on behalf of the Estate of James D. Halvorson, MARIE ANN PAPROCKI, individually and on behalf of the Estate of Dennis Lavelle, RONI LEVINE, individually and on behalf of the Estate of Robert Levine, TERESANNE LOSTRANGIO, individually and on behalf of the Estate of Joseph Lostrangio, MARGARET MAURO, individually and on behalf of the Estate of Dorothy Mauro, RAMON MELENDEZ, individually and

9

on behalf of the Estate of Mary Melendez, PATRICIA MILANO, individually and on behalf of the Estate of Peter T. Milano, IVY MORENO, individually and on behalf of the Estate of Yvette Nichole Moreno, JOANNE LOVETT, individually and on behalf of the Estate of Brian Nunez, ESTATE OF VINCENT A. OGNIBENE, individually and on behalf of the Estate of Philip Paul Ognibene, CHRISTINE PAPASSO, individually and on behalf of the Estate of Salvatore T. Papasso, PATRICIA J. PERRY, individually and on behalf of the Estate of John William Perry, RODNEY RATCHFORD, individually and on behalf of the Estate of Marsha Dianah Ratchford, RODNEY M. RATCHFORD, MARSHEE R. RATCHFORD, RODNEY RATCHFORD FOR THE BENEFIT OF MARANDA C. RATCHFORD, JUDITH REISS, individually and on behalf of the Estate of Joshua Scott Reiss, JOYCE ANN RODAK, individually and on behalf of the Estate of John M. Rodak, CHELSEA NICOLE RODAK, JOYCE ANN RODAK FOR THE BENEFIT OF DEVON MARIE RODAK, JOHN RODAK, REGINA RODAK, JOANNE GORI, DIANE ROMERO, individually and on behalf of the Estate of Elvin Romero, LOREN ROSENTHAL, individually and on behalf of the Estate of Richard Rosenthal, EXPEDITO SANTILLIAN, individually and on behalf of the Estate of Maria Theresa Santillian, ESTER SANTILLIAN, ELLEN SARACINI, individually and on behalf of the Estate of Victor Saracini, GUARDIAN OF ANNE C. SARACINI, JOANNE RENZI, PAUL SCHERTZER, individually and on behalf of the Estate of Scott Schertzer, RONALD S. SLOAN, individually and on behalf of the Estate of Paul K. Sloan, ESTATE OF GEORGE ERIC SMITH, RAYMOND SMITH, KATHERINE SOULAS, individually and on behalf of the Estate of Timothy P. Soulas, RUSSA STEINER, individually and on behalf of the Estate of William R. Steiner, ANGELA S. STERGIOPOULOS, individually and on behalf of the Estate of Andrew Stergiopoulos, GEORGE STERGIOPOULOS, individually and on behalf of the Estate of Andrew Stergiopoulos, SANDRA STRAUB, individually and on behalf of the Estate of Edward W. Straub, JOAN E. TINO, individually and on behalf of the Estate of Jennifer Tino, PAMELA SCHIELE, CHRISTINE BARTON-PENCE, individually and on behalf of the Estate of Jeanmarie Wallendorf, ESTATE OF META WALLER, DOYLE RAYMOND WARD, individually and on behalf of the Estate of Timothy Raymond Ward, GERALD BINGHAM, ALICE CARPENETO, STEPHEN L. CARTLEDGE, MICHELLE WRIGHT, HAOMIN JIAN, FUMEI CHIEN, HUICHUN JIAN, HUI-CHUAN JIAN, HUI-CHIEN CHEN, HUI-ZON JIAN, MICHAEL LOGUIDICE, RALPH S. MAERZ, MARTIN PANIK, ESTATE OF LINDA ELLEN PANIK, MARY LYNN-ANNA PANIK STANLEY, HELEN ROSENTHAL, ALEXANDER ROWE, ED RUSSIN, GLORIA RUSSIN, BARRY RUSSIN, LEONARD ZEPLIN, LEONA ZEPLIN, JOSLIN ZEPLIN,

*Plaintiffs-Appellees,*

JENNY RUBIN, DEBORAH RUBIN, STUART E. HERSH, RENAY FRYM, NOAM ROZENMAN, ELENA ROZENMAN, TZVI ROZENMAN, DANIEL MILLER, ABRAHAM MENDELSON,

*Plaintiffs-Appellees,*

–v.–

ALAVI FOUNDATION, 650 FIFTH AVENUE COMPANY,

*Defendants-Appellants,*

ASSA CORPORATION, ASSA COMPANY LIMITED,

*Defendants.*[*]

_____

Before:

KEARSE, RAGGI, and WESLEY, *Circuit Judges.*

_____

Appeal from an award of summary judgment by the United States District Court for the Southern District of New York (Forrest, *J.*), turning over certain property belonging to Defendants-Appellants to Plaintiffs judgment creditor groups under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 note), and entering final judgment. Because Defendants-Appellants are neither foreign sovereigns nor agencies or instrumentalities thereof under the FSIA, we conclude that Plaintiffs

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

11

could not pursue execution, much less be awarded summary judgment, under that statute.  While Defendants-Appellants' status as agencies or instrumentalities of a declared terrorist entity under the TRIA is not foreclosed as a matter of law, we identify questions of fact as to that status, as well as whether Defendants-Appellants' properties are "blocked assets" under the TRIA, which cannot be decided as a matter of law.  We therefore VACATE the judgment and REMAND for further proceedings consistent with this opinion.

VACATED AND REMANDED.

—————————————

> JAMES L. BERNARD, Stroock & Stroock & Lavan LLP, New York, NY (Curtis C. Mechling, Benjamin Weathers-Lowin, Monica Hanna, Patrick N. Petrocelli, Stroock & Stroock & Lavan LLP, New York, NY; Richard M. Kremen, Dale K. Cathell, Timothy H. Birnbaum, DLA Piper LLP (US), Baltimore, MD; Liviu Vogel, Salon Marrow Dyckman, Newman Broudy LLP, New York, NY; Timothy B. Fleming, Wiggins Childs Pantazis, Fisher Goldfarb PLLC, Washington, D.C.; Benjamin Voce-Gardner, Zuckerman Spaeder LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellees Steven M. Greenbaum, et al., Carols Acosta, et al., Anna Beer, et al., Jason Kirschenbaum, et al., The Estate of Michael Heiser, et al., Deborah D. Peterson, personal representative of the estate of James C. Knipple (Dec.) et al., Fiona Havlish, individually and on behalf of the Estate of Donald G. Havlish, Jr., et al., and Jenny Rubin, et al.*

> RALPH PAUL DUPONT, The Dupont Law Firm LLP, Stamford, CT, *for Plaintiffs-Appellees Edwena R. Hegna, et al.*

> DANIEL S. RUZUMNA (Krista D. Adler, Adam Blumenkrantz, Melissa R. Ginsberg, *on the brief*), Patterson Belknap Webb & Tyler LLP, New York, NY,

12

*for Defendants-Appellants Alavi Foundation and 650 Fifth Avenue Company.*

———————

WESLEY, *Circuit Judge*:

Plaintiffs-Appellees ("Plaintiffs") are direct or indirect victims of terrorist acts linked to the Islamic Republic of Iran ("Iran"), against which they hold unsatisfied money judgments. Plaintiffs contend that they are entitled to enforce these judgments against Defendants-Appellants Alavi Foundation and 650 Fifth Avenue Company (together, "Defendants"),[1] pursuant to the Foreign Sovereign Immunities Act ("FSIA") and the Terrorism Risk Insurance Act ("TRIA").

This appeal requires us to determine whether Defendants qualify, as a matter of law, as the "foreign state" of Iran or an "agency or instrumentality" thereof, such that Defendants' properties may be turned over to help satisfy Plaintiffs' judgments against Iran under the FSIA. We are also called upon to

---

[1] The District Court also granted summary judgment and turnover as to Defendants Assa Corporation and Assa Company Limited ("Assa Limited"), but those entities are not parties to this appeal. *See* App'x 4574–75. Thus, in this opinion, the term "Defendants" refers only to Defendants-Appellants Alavi Foundation and 650 Fifth Avenue Company. Because the Assa Defendants are not parties to this appeal, our decision today does not limit Plaintiffs' ability to attach Assa's assets, including Assa Corporation's 40% ownership of 650 Fifth Avenue Company.

determine whether, under the TRIA, (1) Defendants qualify, as a matter of law, as Iran or an "agency or instrumentality" thereof insofar as Iran is a "foreign state designated as a state sponsor of terrorism," and (2) Defendants' properties are "blocked assets" that may be turned over to help satisfy Plaintiffs' judgments against Iran.

We conclude that Defendants in this case do not *equate* to the "foreign state" of Iran for purposes of the FSIA or the TRIA. We further conclude that Defendants cannot be deemed "agencies or instrumentalities" of Iran under the FSIA, but that Defendants' status as "agencies or instrumentalities" of Iran under the TRIA and their properties' status as "blocked assets" under that statute is not foreclosed as a matter of law. Nevertheless, we identify questions of fact that prevent either of these TRIA questions from being decided on summary judgment. Accordingly, we vacate the summary judgment award in favor of Plaintiffs and remand for further proceedings consistent with this opinion.

## BACKGROUND

"We of course view the record in the light most favorable to [the Defendants], who [are] appealing from an adverse grant of summary judgment."

14

*Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 211 (2d Cir. 2002); *accord*

*Cortes v. MTA New York City Transit*, 802 F.3d 226, 228 (2d Cir. 2015).

## I. Overview of Facts

The background facts of this case are provided in detail in an

accompanying opinion. *In re 650 Fifth Avenue and Related Properties,* 14-2027 ("*In*

*re 650 Fifth Ave.*"). We assume familiarity with that opinion, and provide an

abbreviated version of events here.

### A. Iran's Involvement With The Alavi Foundation and 650 Fifth Avenue Company

The Alavi Foundation ("Alavi" or "the Foundation") traces its origins to

1973, when the Shah of Iran, Mohammad Reza Pahlavi, incorporated the

eponymous Pahlavi Foundation as a New York not-for-profit corporation, and

endowed it with several million dollars. Following the 1979 Iranian Revolution,

the Ayatollah Khomeini ordered the formation of the Bonyad Mostazafan, an

entity charged with managing property expropriated by the revolutionary

government, and the Pahlavi Foundation was renamed the Mostazafan

Foundation of New York. The Foundation took on its present name in 1992.[2]

---

[2] For ease of reference only, we refer to all three iterations of the foundation as "Alavi" throughout the remainder of this opinion.

15

Since its inception, Alavi has purchased and maintained several properties in the United States, including a 36-story office tower at 650 Fifth Avenue in New York City ("the Building"), the construction of which was financed by loans Alavi received from Bank Melli, a bank wholly owned by Iran.

650 Fifth Avenue Company ("650 Fifth Ave. Co." or "the Partnership") is a partnership created under New York law in 1989 as part of a plan to relieve Alavi of tax obligations that it incurred as a result of the mortgages Bank Melli held on the Building. Specifically, Alavi, together with the Government of Iran, the Bonyad Mostazafan, and Bank Melli, agreed to a plan whereby Bank Melli used a chain of straw companies to enter into a partnership with Alavi. Through a series of circular transactions, instead of holding mortgages on the Building, Bank Melli became a 35% (and eventually 40%) owner of 650 Fifth Ave. Co. and, thereby, a partial owner of the Building. *See In re 650 Fifth Ave.*, 14-2027, at 14–19 (discussing details of 1989 tax transaction). Alavi owns the other 60% of 650 Fifth Ave. Co. and, until 2008, served as 650 Fifth Ave. Co.'s managing partner, administering the day-to-day affairs of the Partnership. *See id.* at 18–19 (describing ownership and management of Partnership). Although Assa Corporation, which was owned by Assa Company Limited (collectively, "Assa"),

16

has always been Alavi's record partner in 650 Fifth Ave. Co., Bank Melli has owned the entities since their creation. *See id.* at 14–22 (explaining evidence of Bank Melli's relationship with Assa).

In addition to ample record evidence of Bank Melli's involvement with Alavi, Assa, and 650 Fifth Ave. Co., as detailed in our accompanying opinion, the record also indicates that other Iranian government entities and officials continued to exercise some control over Alavi's affairs after its creation in 1973. As relevant to this action, record evidence shows that (1) from 1982 to 1991, a Bonyad Mostazafan employee sat on Alavi's Board and provided reports about Alavi to Iran's Prime Minister or the head of the Bonyad Mostazafan every three months, *see In re 650 Fifth Ave.*, 14-2027, at 21–22; (2) in the early 1990s, Alavi's Board composition changed "as directed by the Supreme Leader" of Iran, *id.*; (3) around that same time, Iran's Ambassador to the United Nations exercised a "position of responsibility" over Alavi's affairs, *id.*; and (4) in 2007, certain Alavi board members and Alavi's then-President, Farshid Jahedi, met with Iran's Ambassador to the United Nations, Mohammad Khazaee, *see id.* at 27–28. Other record evidence, however, suggests that, at least in the 2000s, Alavi operated independently of Iran. *See, e.g.,* App'x 5705–07 (testimony of Alavi board

17

member Abbas Mirakhor that Alavi's decisions were made by Alavi's Board and President without interference by Iran); App'x 6565–66 (declaration of Alavi's financial manager Hanieh Safakamal that Alavi managed own assets and chose own employees); App'x 6652–53 (declaration of Alavi's program coordinator confirming lack of Iran's participation in Alavi's affairs).

## B. Relevant Sanctions Against Iran

### 1. Financial Sanctions

In March 1995—six years after 650 Fifth Ave. Co.'s formation—President Clinton issued a series of Executive Orders pursuant to the International Emergency Economic Powers Act ("IEEPA"), formally declaring the Government of Iran a threat to this nation's security and imposing broad financial sanctions. *See* Exec. Order No. 12,957, 60 Fed. Reg. 14615 (Mar. 15, 1995); Exec. Order No. 12,959, 60 Fed. Reg. 24757 (May 6, 1995). Those Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, to promulgate rules and regulations to implement the financial sanctions.

Pursuant to that authority, the Treasury Department's Office of Foreign Assets Control ("OFAC") determined that Bank Melli was owned or controlled by the Government of Iran, and thus subjected it to, among other things,

18

limitations on the receipt of services from U.S. financial institutions beginning June 6, 1995, except as authorized by an OFAC license. *See* Implementation of Executive Order No. 12959 With Respect to Iran, 60 Fed. Reg. 40881-02 (Aug. 10, 1995). OFAC also subsequently promulgated a series of Iranian Transactions Regulations ("ITRs") relevant to this action, which took effect on August 20, 1997, and which generally prohibit United States entities from conducting business with or providing services to "the Government of Iran." The "Government of Iran" is defined in the ITRs as "[t]he state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof," "[a]ny person owned or controlled, directly or indirectly, by the foregoing," and "[a]ny person . . . acting or purporting to act, directly or indirectly, for or on behalf of the foregoing." 31 C.F.R. § 560.304 (2012); *see id.* §§ 560.203, 560.204, 560.207, 560.208, 560.301. Alavi and 650 Fifth Ave. Co. are United States entities subject to these orders and regulations and prohibited thereby from conducting business with or providing services to Bank Melli or any other instrumentality owned or controlled by, or acting on behalf of, the Government of Iran.

In 1995, after the first of the relevant Executive Orders imposing sanctions on Iran was issued, Bank Melli formally divested its ownership of Assa. Our

accompanying opinion, *In re 650 Fifth Ave.,* 14-2027, held that there was no genuine dispute of fact that Assa was *owned or controlled* by the Government of Iran even after 1995.  We also held, however, that a triable issue of fact exists as to whether Alavi provided services to Assa after 1995 *knowing* it was so owned or controlled.

## 2. Blocking Regime

In addition to conferring authority on the President to regulate and prohibit transactions to deal with threats to this nation's security, foreign policy, or economy, the IEEPA authorizes the President to block property to address such threats.  *See* 50 U.S.C. § 1702.  In 2012, President Obama, acting pursuant to the authority conferred on him under the IEEPA, issued Executive Order 13,599 "to take additional steps with respect to the national emergency declared in Executive Order 12957 of March 15, 1995, particularly in light of the deceptive practices of the Central Bank of Iran and other Iranian banks to conceal transactions of sanctioned parties."  Exec. Order No. 13,599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012) (hereinafter "Exec. Order 13,599").  As relevant here, that Order states that "[a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States . . . *are*

20

*blocked* and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." *Id.* (emphasis added); *see* 31 C.F.R. § 560.211 (implementing blocking order). The Order defines "Government of Iran" to mean the "Government of Iran, any political subdivision, agency, or instrumentality thereof . . . and any person owned or controlled by, or acting for or on behalf of, the Government of Iran." Exec. Order 13,599.

OFAC periodically publishes (1) a list of "Specially Designated Nationals and Blocked Persons" ("SDN List"), and (2) since January 16, 2016, a list of persons whose property is blocked pursuant to Executive Order 13,599 because they satisfy Executive Order 13,599's definition of "Government of Iran" or "Iranian financial institution" ("Executive Order 13,599 List"). *See* 31 C.F.R. § 560.211, Note 1 (2016). Defendants Alavi and 650 Fifth Ave. Co. have never been named on either list. Bank Melli and Assa, however, have both been named on the SDN List: in 2007, Bank Melli was added to the SDN List pursuant to weapons of mass destruction ("WMD") nonproliferation sanctions and, in 2008, Assa was added to the SDN List based on the Treasury Department's

determination that Assa was a front company for Bank Melli.[3]

On January 16, 2016, the United States implemented the Joint Comprehensive Plan of Action ("JCPOA"), a multilateral agreement pursuant to which the United States lifted nuclear-related sanctions previously imposed on Iran and removed various entities subject to those sanctions from the SDN List,

---

[3] Prior to President Obama's issuance of Executive Order 13,599, President Bush issued Executive Order 13,382, which ordered that all United States "property and interests in property of," *inter alia*, "any foreign person determined by the Secretary of State . . . to have engaged . . . in activities or transactions that have materially contributed to . . . the proliferation of weapons of mass destruction or their means of delivery" or "any person determined by the Secretary of the Treasury . . . to have provided . . . financial, material, technological, or other support for, or goods or services in support of, any" such activity, "are blocked." Exec. Order No. 13,382, 70 Fed. Reg. 38567, 38567 (June 28, 2005) (explaining that Executive Order 13,382 imposed additional sanctions to address national emergency declared in Executive Order 12,928 regarding proliferation of weapons of mass destruction). It was pursuant to those WMD nonproliferation sanctions that Bank Melli and Assa were added to the SDN List. *See* 31 C.F.R. § 544.201, Note 1 (explaining that entities whose property was blocked pursuant to Executive Order 13,382 were added to SDN list with identifier "NPWMD"); OFAC, *Changes To List of Specially Designated Nationals and Blocked Persons Since January 1, 2007*, http://www.treasury.gov/resource-center/sanctions/SDN-List/Documents/sdnew07.pdf (last visited July 9, 2016) (indicating Bank Melli's addition to SDN list under identifier "NPWMD"); OFAC, *Changes to List of Specially Designated Nationals and Blocked Persons Since January 1, 2008*, https://www.treasury.gov/resource-center/sanctions/SDN-List/Documents/sdnew08.pdf (last visited July 9, 2016) (same for Assa); *see also* U.S. Dep't of Treasury, Press Release, *Treasury Designates Bank Melli Front Company in New York City*, http://www.treasury.gov/press-center/press-releases/Pages/hp1330.aspx (last visited June 9, 2016) (explaining "scheme to use a front company set up by Bank Melli – a known proliferator [of weapons of mass destruction] – to funnel money from the United States to Iran" (internal quotation marks omitted)).

including Bank Melli and Assa. *See* JCPOA Annex II; *see also id.* Attachment 3 (identifying Assa Co. Ltd., Assa Corp., and Bank Melli as entities removed from SDN List pursuant to JCPOA). Bank Melli was thereafter added to the Executive Order 13,599 List. *See* OFAC, *List of Persons Identified as Blocked Solely Pursuant to Executive Order 13599*, https://www.treasury.gov/ofac/downloads/13599/13599list.pdf (last visited July 9, 2016). The Treasury Department has explained that even after January 16, 2016, "individuals and entities meeting the definition of the Government of Iran or an Iranian financial institution [as defined in the ITRs], remain persons whose property and interests in property are blocked pursuant to E.O. 13599 and section 560.211" of the ITRs and, accordingly, "U.S. persons continue to be broadly prohibited from engaging in transactions or dealings with these individuals and entities." U.S. Dep't of Treasury, *Guidance Relating to the Lifting of Certain U.S. Sanctions Pursuant to the Joint Comprehensive Plan of Action on Implementation Day*, at 28 (Jan. 16, 2016), https://www.treasury.gov/resource-center/sanctions/Programs/Documents/implement_guide_jcpoa.pdf (hereinafter "*JCPOA Guidance*").

23

## II.    Procedural History

Plaintiffs began filing these turnover actions in December 2008, shortly after the Government initiated its civil forfeiture action.[4]  Though Plaintiffs and the Government both seek to seize Defendants' properties, they proceed on fundamentally different theories that require fundamentally different proofs. Plaintiffs hold money judgments *against Iran*.  To take Defendants' properties under the FSIA or the TRIA, then, Plaintiffs must show (at least) that Defendants somehow "*are*" Iran or an agency or instrumentality thereof as contemplated by those statutes.  The Government, by contrast, must show that Defendants *committed a forfeitable offense* under the IEEPA, the ITRs, or the money laundering statutes, a burden that does not necessarily require proof that Defendants are the

---

[4] The Government first filed suit on December 17, 2008, seeking civil forfeiture of Assa's properties, including Assa's minority interest in the 650 Fifth Ave. Co.  Assa was simultaneously added to the SDN List based on its relationship with Bank Melli. *See supra* n.3.  The Government amended its forfeiture complaint on November 12, 2009 to add Defendants' properties.  The amended forfeiture complaint alleges that Alavi violated the IEEPA by providing services to its partner in the 650 Fifth Ave. Co., Assa (and, thus, Bank Melli), and that Defendants' properties were "proceeds" of the unlawful services or otherwise involved in money laundering transactions.

state of Iran or an agency or instrumentality thereof.[5]  The Government need not and does not allege that Defendants "are" Iran.

Defendants opposed Plaintiffs' proposed attachments, moving for summary judgment in this turnover action on August 17, 2013.  They argued, *inter alia*, that the court lacked jurisdiction to hear Plaintiffs' FSIA or TRIA claims because neither Defendant meets the definition of a "foreign state" or an "agency or instrumentality" of a foreign state under the FSIA, and, further, as to the TRIA claim, that Defendants' assets have not been seized or frozen by the United States.  The District Court denied Defendants' summary judgment motion.

Shortly thereafter, Plaintiffs moved for an award of summary judgment and turnover of Defendants' properties.[6]  Plaintiffs argued that the Defendants "are" Iran because they meet the definition of "Government of Iran" set forth in Executive Order 13,599 and the implementing ITRs.  *See* Exec. Order 13,599; 31 C.F.R. § 560.304.

---

[5] We express no opinion here regarding the merits of the civil forfeiture appeal.  *See In re 650 Fifth Avenue and Related Properties*, 14-2027.

[6] Plaintiffs subsequently filed a supplemental summary judgment motion, seeking turnover of seven Alavi-only owned properties and three bank accounts.

In an Opinion and Order,[7] the District Court held that it had subject matter

jurisdiction over the turnover action because Defendants "are" the foreign state

of Iran for FSIA and TRIA purposes.  *See In re 650 Fifth Avenue and Related

Properties*, No. 08 Civ. 10934(KBF), 2014 WL 1516328 (S.D.N.Y. Apr. 18, 2014) ("*In

re 650 Fifth Ave. Private Action*").  The District Court's conclusion rested on three

alternative grounds.  First, the District Court ruled that Defendants met the

definition of "Government of Iran" under Executive Order 13,599 and the ITRs,

which definitions it concluded could be used to supplement the FSIA's definition

of "foreign state."  *Id.* at *10–11.  Second, the District Court *sua sponte* held that

Defendants could also be considered a foreign state as the "alter egos" of Iran.

*Id.* at *12.  Third, the District Court *sua sponte* concluded that Defendants "are"

Iran because they satisfy the FSIA's definition of agency or instrumentality.  *Id.* at

*13–14.  The District Court further ruled that because Defendants "are" Iran, they

are a "terrorist party" within the meaning of the TRIA, and their assets are

"blocked" under Executive Order 13,599.  *Id.* at *14–15.  Based on these

conclusions, the District Court granted Plaintiffs summary judgment on their

---

[7] Though initially issued on March 28, 2014, the opinion and order was subsequently withdrawn and a corrected version re-issued on April 18, 2014.

26

FSIA and TRIA claims and ordered the turnover of Defendants' specified assets.

Following entry of a final judgment, Defendants timely appealed.

## DISCUSSION

We review *de novo* a district court's legal conclusions under the FSIA, including whether a foreign state or its property is or is not shielded by immunity. *See Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 286 (2d Cir. 2011). "We accord deferential review to a district court ruling on a petition for an order of attachment or execution under the FSIA, and we will reverse only for abuse of discretion." *Id.* at 285–86. A district court abuses its discretion "if it applies legal standards incorrectly, relies on clearly erroneous findings of fact, or proceeds on the basis of an erroneous view of the applicable law." *Id.* at 286 (internal quotation marks omitted).

## I. The Foreign Sovereign Immunities Act

The FSIA provides the exclusive basis for obtaining subject matter jurisdiction over a foreign state. *See* 28 U.S.C. § 1604 *et seq.*; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). It states that foreign states "shall be immune from the jurisdiction of the courts of the United States and of

27

the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604; *see Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

In the underlying actions giving rise to Plaintiffs' money judgments, district courts exercised subject matter jurisdiction over Iran pursuant to the Act's terrorism exception, 28 U.S.C. § 1605A.[8]  This exception abrogates immunity where "money damages are sought against a foreign state for personal injury or death" caused by certain acts, such as torture, extrajudicial killing, or material support thereof, if such acts are "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." *Id.*  Where this exception applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606; *see also Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010).

---

[8] Some plaintiff members obtained judgments pursuant to § 1605A's predecessor, § 1605(a)(7), which was in effect until it was repealed and replaced by § 1605A in January 2008.  *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. 110–181, Div. A, sec. 1083, 122 Stat. 3, 338–44 (repealing 28 U.S.C. § 1605(a)(7) and creating 28 U.S.C. § 1605A).  The version supporting Plaintiffs' underlying judgments is immaterial for resolution of this appeal.

In addition to conferring a presumption of jurisdictional immunity on foreign sovereigns, the FSIA presumes attachment and execution immunity over a foreign sovereign's property. *See Walters*, 651 F.3d at 287–88. Thus, where a valid judgment has been entered against a foreign state, the foreign state's United States property is immune from attachment and execution unless a statutory exception applies. *See* 28 U.S.C. § 1609.

The District Court found three attachment exceptions applicable to Defendants: two under the FSIA, *see* §§ 1610(a)(7), 1610(g), and one under § 201 of the TRIA, codified as a note to § 1610 of the FSIA. Each provides instances where a foreign sovereign's property is attachable to satisfy terrorism-related judgments. Here, we address the first two exceptions for attachment and execution of a foreign state's property, FSIA §§ 1610(a)(7), 1610(g); below, we address the applicability of § 201 of the TRIA.

## A. FSIA Exceptions: § 1610(g) and § 1610(a)(7)

Section 1610(g) strips FSIA attachment immunity from the property of a "foreign state" or of its "agency or instrumentality" if the underlying judgment was entered under § 1605A's terrorism exception. Section 1610(a)(7) does the same with particular reference to property "used for a commercial activity in the

29

United States," where the underlying judgment was entered under either

§ 1605A or its predecessor. *Id.* § 1610(a)(7). Whether these exceptions afford

attachment jurisdiction over Plaintiffs' turnover claims thus turns on the

threshold question of whether Defendants may be deemed a "foreign state" or an

"agency or instrumentality" of a foreign state under the FSIA.[9]

### B. Foreign States under the FSIA

The FSIA does not define "foreign state" except to state that it "includes a

political subdivision of a foreign state or an agency or instrumentality of a

foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). Our Court has

long construed "foreign state" as used in the FSIA to mean an entity bearing the

"attributes of statehood," which include a defined territory and population, self-

governance and foreign relations, and the capacity to wage war and to enter into

international agreements. *Morgan Guaranty Tr. Co. of N.Y. v. Republic of Palau*

("*Morgan Guaranty*"), 924 F.2d 1237, 1243–44 (2d Cir. 1991) (citing *United States v.*

*Curtiss–Wright Export Corp.*, 299 U.S. 304, 318–19 (1936), and RESTATEMENT

(THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 201 (1987))

---

[9] Assuming this threshold question is satisfied, attachment jurisdiction further depends on additional inquiries, such as, under FSIA § 1610(a)(7), whether Defendants' properties are "used for commercial activity."

(concluding that U.S. trust territory of Palau was not foreign state within meaning of FSIA because, although it bore some attributes of statehood, it lacked ability to maintain diplomatic ties, enter into treaties, and join other states in making international law); *see Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 47 (2d Cir. 1991) (rejecting FSIA defense of Palestine Liberation Organization because it did not meet definition of "foreign state" as one that has "a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities" (alterations and internal quotation marks omitted)).

The Supreme Court has cited these traditional sovereign characteristics in concluding that Somalia's former prime minister could not be sued as a "foreign state" under the FSIA in a suit brought by Somali victims of governmental abuse in the 1980s. *Samantar v. Yousuf*, 560 U.S. 305, 308, 314–15 (2010). The Court traced the history of sovereign immunity from the common law through the enactment of the FSIA, analyzed the text and legislative history of the statute, and concluded that the FSIA codified a "restrictive theory of sovereign immunity," with "[t]he term 'foreign state' on its face indicat[ing] a body politic

31

that governs a particular territory." *Id*. at 314 (citing RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 4 (1964–1965)). Following this controlling precedent here, we conclude that Defendants, a New York-registered foundation and similarly registered partnership, themselves bear none of the attributes of statehood and, thus, cannot be equated to the foreign state of Iran.

In concluding otherwise, the District Court relied on Executive Order 13,599, which defines the "Government of Iran" to include "any person owned or controlled by, or acting for or on behalf of, the Government of Iran." Exec. Order 13,599. Similarly, the ITRs' "General Definitions" subchapter defines the "Government of Iran" to include "[a]ny person to the extent that such person is, or has been, since the effective date, acting or purporting to act, directly or indirectly, for or on behalf of the [Government of Iran]." 31 C.F.R. § 560.304. This reliance on Executive Branch definitions to construe "foreign state" under the FSIA raises several concerns.

First, *Morgan Guaranty* did not bless the use of just any "other sources" in divining the meaning of "foreign state." 924 F.2d at 1243. In *Morgan Guaranty*, we looked specifically to international law in identifying the "attributes of statehood" that define a "foreign state." *Id*. at 1243–44. *Morgan Guaranty* did not

32

invite courts to substitute other sources for the ones it employed and thereby to reach a different conclusion from the one dictated by that case in construing the identical statutory term.

Second, Executive Order 13,599 expressly states that its expansive definition of the Government of Iran is "[f]or the purpose of this order."  Exec. Order 13,599.  The Order and its implementing ITRs were designed principally to further the United States' sanctioning regime against Iran.  *See* 31 C.F.R. § 560.304.  Nowhere do those sources purport to supplement the FSIA's definition of a foreign state.  Thus, we conclude that these Executive Branch definitions, however helpful in identifying forfeitable offenses, cannot be used to expand sovereign statehood under the FSIA for a single "foreign state."

This conclusion is consistent with a principal purpose of the FSIA, namely, "to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process."  H.R. Rep. No. 94-1487, at *7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6606; *see also Samantar*, 560 U.S. at 323 n.19 (noting that the State Department

"sought and supported the elimination of its role with respect to claims against foreign states and their agencies or instrumentalities").

In borrowing from Executive Branch definitions of Iran, the District Court erroneously reasoned that the key question here is not whether Iran is a foreign state (it certainly is), but "whether the [D]efendants have acted in such a manner as to render them, too, equivalent to Iran." *In re 650 Fifth Ave. Private Action*, 2014 WL 1516328, at *11. That miscast the relevant inquiry for determining if a defendant satisfies the definition of "foreign state" under the FSIA, which asks whether that defendant itself possesses of the attributes of statehood long established in international law.

*Samantar* illustrates this seemingly semantic but enormously substantive distinction. Somalia, like Iran, is certainly a "foreign state," but in considering whether Somalia's former prime minister was a "foreign state" under the FSIA, the Supreme Court did not ask, as the District Court did here, "whether the defendant[] . . . acted in such a manner as to render [him] . . . equivalent to [the state]." *Id.* Indeed, the Supreme Court expressly rejected an argument urging that line of inquiry. *See Samantar*, 560 U.S. at 318–19. Instead, the Court's inquiry turned on whether the defendant bore traditional attributes of statehood (or

34

otherwise qualified as a subdivision, agency, or instrumentality)—*not* on

whether the defendant acted sufficiently on behalf of the foreign state. *Id*.

In sum, we conclude that a "foreign state" under the FSIA is not properly

defined by reference to an Executive Order authorizing broad sanctions on a

particular country. Rather, it is defined according to established constructions of

the term. Because there is no question here that Defendants lack the traditional

attributes of statehood, they are not themselves "foreign states."

### C. Agencies or Instrumentalities of a Foreign State under the FSIA

The FSIA does, however, reach beyond the international law

understanding of foreign states to the extent it includes within that term, for

FSIA purposes, a foreign state's agents or instrumentalities. *See* 28 U.S.C.

§ 1603(a) (stating that "'foreign state' . . . includes . . . an agency or

instrumentality" thereof). The FSIA defines "agency or instrumentality" as

follows:

> (a) An "agency or instrumentality of a foreign state" means any entity—
>
>> (1) which is a separate legal person, corporate or otherwise, and
>>
>> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership

interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). All three statutory elements must be satisfied to render an entity an agency or instrumentality under the FSIA. Because jurisdiction "depends upon the state of things at the time . . . the action [is] brought," *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (internal quotation marks omitted), an entity's agency or instrumentality status under the FSIA "is determined at the time of the filing of the complaint," *id.* at 480, and not necessarily "as of the time an alleged tort or other actionable wrong occurred," *id.* at 471.

Defendants argue that the District Court erred in its alternative ruling that, as a matter of law, they each "fall within the definition of an 'agency or instrumentality of a foreign state' under 28 U.S.C. § 1603(b), and in turn constitute a 'foreign state' itself within the meaning of the FSIA." *In re 650 Fifth Ave. Private Action*, 2014 WL 1516328, at *13. Defendants do not dispute that they are "separate legal person[s], corporate or otherwise," from Iran and thus that they meet the first prong for FSIA agency or instrumentality status under § 1603(b)(1). They do argue, however, that they are not "organ[s]" of, or majority

36

owned by, Iran under § 1603(b)(2), and that they are U.S. citizens exempted from FSIA agency or instrumentality status under § 1603(b)(3). Because we agree with the latter argument, we need not address the former.

To qualify as an agency or instrumentality of a foreign state under the FSIA, § 1603(b)(3) states that the person or entity cannot be "a citizen of a State of the United States as defined in section 1332(c) and (e) of this title." 28 U.S.C. § 1603(b)(3). Section 1332(c) defines the citizenship of corporations (and representatives of decedents' estates). *See id.* § 1332(c). Section 1332(e) defines what is meant by "States." *See id.* § 1332(e).

In deciding that the Defendants were not "citizen[s] of a State of the United States" for purposes of § 1603(b)(3), the District Court stated that it was "mindful that the Shah incorporated the Foundation in New York in 1973, and that the partnership was created in New York." *In re 650 Fifth Ave. Private Action*, 2014 WL 1516328, at *13. The District Court nonetheless deemed Defendants citizens of Iran under the equitable "alter ego" principles set forth in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983), which permit courts to disregard defendants' corporate form when "'the doctrine of corporate entity . . . would work fraud or injustice.'" *In re 650 Fifth Ave. Private*

*Action*, 2014 WL 1516328, at *13 (quoting *Bancec*, 462 U.S. at 629).  The court reasoned that "[t]o allow [Defendants'] corporate status as American entities to dominate their actual function as organs of Iran would violate the [fraud or injustice] principles" set forth in *Bancec*.  *Id.*

As an initial matter, we note that Plaintiffs do not here challenge the District Court's conclusion that § 1603(b)(3) would ordinarily preclude Alavi, a New York-based corporation, and 650 Fifth Ave. Co., a New York-based partnership, from satisfying the FSIA's definition of agency or instrumentality. *See In re 650 Fifth Ave. Private Action*, 2014 WL 1516328, at *13–14.  Indeed, even when moving for summary judgment before the District Court, Plaintiffs did not argue that Defendants satisfied § 1603(b)'s definition of "agencies or instrumentalities."  On appeal, Plaintiffs argue only that the District Court "properly disregarded the fact that Defendants are . . . citizens of [New York]." Acosta Appellees Br. 108–12.  Thus, we assume without deciding that Defendants cannot satisfy § 1603(b)(3) unless *Bancec* can properly be applied to disregard an entity's citizenship. [10]

---

[10] Alavi was incorporated under the laws of the state of New York in 1973 and has been a recognized New York not-for-profit corporation ever since.  Certainly, nothing in the

record indicates that New York has ever sought to withdraw that recognition. Thus, Alavi is unequivocally a "citizen of a State of the United States" that falls outside the ambit of agency or instrumentality status under § 1603(b)(3). *See* 28 U.S.C. § 1332(c).

Unlike Alavi, 650 Fifth Ave. Co. is not a corporation; it is a partnership. The pertinent language of the FSIA excludes from the definition of "agency or instrumentality" an entity that is "a citizen of a State of the United States *as defined in* section 1332(c) and (e) of this title." 28 U.S.C. § 1603(b)(3) (emphasis added). Section 1332(c), which defines the citizenship of corporations, makes no mention of partnerships, *see id.* § 1332(c), and Congress has "never expanded this grant of citizenship to include artificial entities other than corporations." *Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016); *see also Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 84 n.1 (2005) (noting that "for diversity purposes, a partnership entity, unlike a corporation, does not rank as a citizen"); *Chapman v. Barney*, 129 U.S. 677, 682 (1889) (declining to read § 1332(c) to encompass a "mere partnership"). Section 1332(e) is also silent as to partnerships. It simply defines "States," to include United States "Territories, the District of Columbia, and the Commonwealth of Puerto Rico." 28 U.S.C. § 1332(e).

To the extent the Class Action Fairness Act ("CAFA"), Pub. L. No. 109–2, 119 Stat. 4, codified at 28 U.S.C. § 1332(d)(10), provides that "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized," that section displaces the understanding of unincorporated-association citizenship only for purposes of the CAFA, *see Ferrell v. Exp. Check Advance of SC LLC*, 591 F.3d 698, 702 (4th Cir. 2010). Congress did not amend § 1603(b) to incorporate this CAFA definition. Rather, it renumbered prior § 1332(d) (defining "States") as § 1332(e) to accommodate CAFA's insertion as § 1332(d), *see* Pub. L. No. 109-2, § 4(a)(1), 119 Stat. 9, and—in the same legislation—amended FSIA § 1603(b)(3) to account for that renumbering. Prior to CAFA, § 1603(b)(3) excluded from its definition of "agency or instrumentality" "a citizen of a State of the United States as defined in section 1332(c) and (d) of this title." *See* Pub. L. No. 109-2, § 4 (b)(2), 119 Stat. 12. With the insertion of CAFA as subsection (d), Congress amended § 1603(b)(3) only by changing "(d)" to "(e)." *See id.*

We assume that Congress was aware of § 1603(b)(3) when it enacted CAFA's citizenship provision for unincorporated associations, and when it amended § 1603(b)(3) to note only a numbering change in § 1332. In these circumstances, we construe § 1603(b)(3) to incorporate only the § 1332(c) definition of corporations, and not to extend to partnerships. Because this argument was not pursued on appeal, however, and

We conclude that *Bancec* cannot be so applied to § 1603(b)(3), which unambiguously exempts from FSIA agency or instrumentality status all "citizen[s] of a State of the United States as defined in section 1332(c) and (e) of this title." 28 U.S.C. § 1603(b)(3). As explained *infra*, *Bancec*'s "fraud or injustice" exception is appropriately considered in entertaining challenges to the presumption of corporate separateness and alter ego status, as was the case in *Bancec* itself. It is not a basis for questioning corporate citizenship in the context of determining agency or instrumentality status as defined in the FSIA. *See Bancec*, 462 U.S. at 629.

Accordingly, because (1) Plaintiffs do not here challenge the District Court's conclusion that § 1603(b)(3) would ordinarily preclude Alavi and 650 Fifth Ave. Co., both U.S.-based entities, from satisfying the FSIA's definition of agency or instrumentality, and (2) *Bancec* cannot be used to disregard § 1603(b)(3)'s exemption of U.S.-citizen entities from that definition, we conclude

Plaintiffs do not here challenge the District Court's conclusion that, absent equitable principles under *Bancec* permitting the court to disregard Defendants' corporate form, § 1603(b)(3) precludes both Alavi and 650 Fifth Avenue from satisfying the definition of "agency or instrumentality," we assume without deciding that § 1603(b)(3) exempts both Alavi and 650 Fifth Ave. Co. from agency or instrumentality status under the FSIA.

40

that Defendants are statutorily disqualified as agencies or instrumentalities of Iran under FSIA §§ 1610(a)(7) and 1610(g).

### D. Alter Ego Principles

The District Court also used *Bancec* separately to conclude that, regardless of Defendants' status as agencies or instrumentalities of Iran, they are Iran's alter egos and, therefore, jurisdiction properly lies over Defendants just as it would over Iran. *See In re 650 Fifth Ave. Private Action*, 2014 WL 1516328, at *12. Defendants fault the District Court's conclusion on two grounds: (1) *Bancec*'s alter ego analysis does not permit a court to expand FSIA jurisdiction to reach entities that do not otherwise satisfy that statute's definition of "agency or instrumentality," and (2) in any event, the record evidence is insufficient to establish that Defendants are alter egos of Iran. Although we disagree with the first argument, we agree with the second and, accordingly, conclude as a matter of law that Defendants cannot be equated to the foreign state of Iran under *Bancec*.

In arguing that *Bancec*'s alter ego principles cannot provide jurisdiction over an entity that does not otherwise satisfy the FSIA's agency or instrumentality definition, Defendants maintain that the issue in *Bancec* was

41

whether an entity that indisputably qualified as an agency or instrumentality could be held substantively liable for the debts of a foreign state despite its separate incorporation and juridical status. In *Bancec*, a Cuban government-owned trade bank sued an American bank to collect an unpaid debt, and the American bank counterclaimed, asserting a right to offset the value of foreign assets that had been nationalized by the Cuban government. *See Bancec*, 462 U.S. at 613–15. The Cuban bank, relying on its separate juridical status, asserted that it could not be held liable for Cuba's debts. *See id.* at 613. The Supreme Court disagreed and, although recognizing the presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," *id.* at 626–27, held that the presumption could be rebutted, and an alter ego relationship established, if (1) the instrumentality "is so extensively controlled by its owner that a relationship of principal and agent is created," or (2) the recognition of an instrumentality's separate legal status would work a "fraud or injustice," *id.* at 629 (internal quotation marks omitted).

Defendants' argument that this alter ego test cannot be used to establish FSIA jurisdiction is foreclosed by *U.S. Fidelity & Guaranty Co. v. Braspetro Oil*

*Services Co.*, 199 F.3d 94 (2d Cir. 1999) (per curiam).  There, we adopted the

district court's reasoning in affirming a finding of FSIA jurisdiction over a party

(Brasoil) based on *Bancec*'s alter ego analysis.  *See U.S. Fid. & Guar. Co. v. Braspetro*

*Oil Servs. Co.*, No. 97 Civ. 6124(JGK), 1999 WL 307666, at *7–11 (S.D.N.Y. May 17,

1999), *aff'd*, *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs.*, 199 F.3d 94 (2d Cir. 1999).[11]

Brasoil itself failed to satisfy the FSIA's agency or instrumentality test because it

was not majority-owned by a foreign state or an organ of a foreign state, and was

created under the laws of a third country.  *See U.S. Fid.  & Guar. Co. v. Braspetro*

*Oil Servs.*, 1999 WL 307666, at *6–7.  The court nonetheless concluded that Brasoil

was a foreign state under the FSIA because it was the alter ego of two entities

(Petrobras and Braspetro) that constituted "foreign states" under the FSIA by

virtue of their status as agencies or instrumentalities of Brazil.  *See id.* at *7, 9, 11.[12]

The court explained that "[a]lthough *Bancec* dealt with the ability of an American

corporation which was sued by an instrumentality of Cuba to set off its own

---

[11] See *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 199 F.3d at 98 ("In case number 99-7603(L) [*i.e.*, the action against Brasoil], we affirm the district court's findings of FSIA subject matter jurisdiction and personal jurisdiction for substantially the same reasons set forth in the court's May 17, 1999 opinion and order.").

[12] In so concluding, the District Court did not rely on *Bancec* to disregard one of § 1603(b)'s requirements, as the District Court did here.  *See infra* at 40.

liabilities against the liabilities of Cuba, courts have applied *Bancec* to determine

FSIA jurisdiction." *Id.* at \*7 n.5. Accordingly, the court determined that this non-

agency or instrumentality could be considered a foreign state under alter ego

analysis, and denied Brasoil's motion for lack of subject matter jurisdiction. *See*

*id.* at \*6–7, 11–14. Defendants' argument that they are legally foreclosed from

qualifying as Iran's alter egos for jurisdictional purposes, therefore, fails.[13]

---

[13] *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), on which Defendants rely, warrants no different conclusion. There, foreign-corporation defendants sought to remove suit to federal court on the ground that they were agencies or instrumentalities of Israel and, therefore, the suit was "'against a foreign state as defined in 28 U.S.C. § 1603(a).'" *Id.* at 473 (alterations omitted) (quoting 28 U.S.C. § 1441(d)). The Supreme Court concluded that defendants were not agencies or instrumentalities because their shares were not owned by Israel but, rather, by other agencies or instrumentalities thereof. *See id.* at 473–74 (holding that "subsidiary of an instrumentality is not itself entitled to instrumentality status" because § 1603(b)(2) only provides instrumentality status to entities "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof" (internal quotation marks omitted)). In so concluding, the Court rejected the defendants' assertion that Israel's "considerable control over their operations" rendered them agencies or instrumentalities, because § 1603(b)(2) requires ownership, not control. *Id.* at 477. Insofar as Defendants here contend that *Dole Food* demonstrates that *Bancec*'s control prong cannot be used to extend jurisdiction to an entity that does not otherwise satisfy § 1603(b), we are not persuaded. *Dole Food* did not address whether defendants there could be considered Israel's alter egos under *Bancec* and there is no indication that defendants asserted removal jurisdiction on that ground. *See id.* at 472 (explaining that defendants "claimed to be instrumentalities of a foreign state as defined by the FSIA, entitling them to removal"). By contrast, here, in addition to concluding that Defendants are agencies or instrumentalities of Iran under § 1603(b), the District Court separately concluded that Defendants equate to the foreign state of Iran based on an alter ego analysis.

44

Nevertheless, we conclude that there is no record evidence that Alavi and, therefore, 650 Fifth Ave. Co., of which Alavi owns 60%, is "so extensively controlled by [Iran] that a relationship of principal and agent is created." *Bancec*, 462 U.S. at 629. The "touchstone inquiry for 'extensive control'" is "whether the sovereign state exercise[d] significant and repeated control over the instrumentality's day-to-day operations." *EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 91 (2d Cir. 2015). The factors relevant to this inquiry include "whether the sovereign nation: (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state." *Id.*

Here, the record evidence cited by the District Court and Plaintiffs indicates, at most, Iran's high-level involvement in Alavi's affairs: (1) the Shah created Alavi in 1973, (2) the Bonyad Mostazafan and Bank Melli assisted Alavi in resolving its tax problem in the 1980s, (3) the Ayatollah directed the removal

45

of certain board members, (4) Iran's Ambassador to the United Nations had some supervisory role,[14] and (5) one Bonyad Mostazafan employee sat on the Alavi board. This evidence, however, is insufficient to demonstrate Iran's *disregard* for Alavi's separate corporate form, *see EM Ltd.*, 800 F.3d at 91, much less Iran's exercise of *day-to-day* control over Alavi. Indeed, Plaintiffs fail to identify any record evidence suggesting such control. *See id.* at 92–94 (concluding that allegations that the "President . . . appoint[ed] [Argentina's central bank's] officers for an unspecified period without Senate approval and . . . remov[ed]

---

[14] Insofar as Plaintiffs rely in particular on alleged notes from an October 2007 meeting between Alavi's President and Iran's Ambassador to the United Nations, Mohammad Khazaee—even assuming the speaker identified in those notes is Khazaee, *see infra* at 62–63 (discussing ambiguity of notes)—Khazaee's statements that he had to "see proposed allocations before a final decision is reached," and be "kept informed regarding the general on goings and allocations," App'x 8724–25, do not suggest the requisite day-to-day control over Alavi's affairs. *See EM Ltd.*, 800 F.3d at 94 (concluding that allegations that Argentina sought assistance of central bank in responding to debt crisis and "took steps to ensure that [the bank] shared its policies and goals during this time" were insufficient to demonstrate "complete takeover" of bank's day-to-day functions as required by *Bancec*). As one of Alavi's board members, Mirakhor, explained, Iran's Ambassador to the United Nations did not control the Board's decisions or how Alavi was run, and any involvement by the Ambassador was consistent with his responsibility over cultural, educational, and religious affairs. *See* App'x 5705 (explaining that he did not "find it . . . strange that the ambassador to UN would be interested" in Alavi's affairs because Alavi's stated mission was to support the study of Iranian culture and language). Nor are we persuaded that the Ambassador's involvement in one settlement of a lawsuit against Alavi in 2004 demonstrates "complete takeover" of Alavi's day-to-day affairs. *EM Ltd.*, 800 F.3d at 95.

BCRA governors who supported the central bank's independence from the executive branch," and that Argentina sought assistance of bank in responding to debt crisis were insufficient to show day-to-day control under *Bancec*); *cf. McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351–52 (D.C. Cir. 1995) (concluding that *Bancec* presumption of separateness was rebutted where government entities "held 52 percent of [the corporation's] stock and controlled six of the seven seats on its board of directors," government shareholders "forced the [corporation] to disregard its commercial missions," and Iran influenced "[r]outine business decisions, such as declaring and paying dividends to shareholders and honoring [the corporation's] contractual commitments").  Thus, given the lack of evidence demonstrating Iran's day-to-day control of Alavi, we conclude, as a matter of law, that Defendants cannot be deemed Iran's alter egos under *Bancec*.[15]

---

[15] The District Court did not conclude, and Plaintiffs do not here argue, that even assuming Iran did not exercise sufficient control over Alavi, under *Bancec*'s second prong recognizing Defendants' separate legal status would "work a fraud or injustice." *EM Ltd.*, 800 F.3d at 91.  Any such argument, therefore, is waived.  *See Vera v. Republic of Cuba*, 802 F.3d 242, 246 (2d Cir. 2015) (stating that arguments not raised on appeal are deemed waived).

## II.   The Terrorism Risk Insurance Act

The TRIA provides jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA if certain statutory elements are satisfied. *Weinstein*, 609 F.3d at 52.  Section 201(a) of the TRIA sets forth these required elements:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), Pub. L. No. 107-297, sec. 201(a), 116 Stat. 2322, 2337–40 (2012) (codified at 28 U.S.C. § 1610 note).  Here, neither party disputes that there was original jurisdiction under the FSIA for the Plaintiffs' underlying judgments.

Thus, to attach Defendants' properties under the TRIA, Plaintiffs must show (1) that the Defendants are a "terrorist party" or an "agency or instrumentality of that terrorist party," and (2) that the Defendants' properties are "blocked assets."  *Id.*  For the same reasons we rejected the conclusion that Defendants "are" the foreign state of Iran for purposes of the FSIA, we reach that

48

same conclusion insofar as the state of Iran is a designated "terrorist party" under the TRIA. We conclude, however, that insofar as the attachment jurisdiction of both statutes also reaches an "agency or instrumentality" of Iran, the FSIA's definition of that phrase in § 1603(b) does not apply to the TRIA. Therefore, our conclusion that Defendants cannot be deemed agencies or instrumentalities of Iran under the FSIA does not prevent Defendants from qualifying as agencies or instrumentalities of Iran under the TRIA. We nevertheless remand the case for further proceedings because material questions of fact preclude a summary judgment determination that (1) Defendants are, indeed, agencies or instrumentalities for TRIA purposes, and (2) their properties are "blocked assets."

### A. Terrorist Parties under the TRIA

Under the TRIA, three entities qualify as a "terrorist party": (1) "a terrorist," (2) "a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act [("INA")] (8 U.S.C. 1182(a)(3)(B)(vi)))," or (3) "a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." TRIA § 201(d)(4). Iran is a

"foreign state designated as a state sponsor of terrorism" under TRIA § 201(d)(4),

making it a "terrorist party" for TRIA purposes. *See* Determination Pursuant to

Section 6(i) of the Export Administration Act of 1979 – Iran, 49 Fed. Reg. 2836-02

(Jan. 23, 1984); *accord Weinstein*, 609 F.3d at 48.

The District Court held that Defendants also qualify as a "terrorist party"

under the TRIA. Its reasoning was as follows: (1) Iran has been designated as a

"state sponsor of terrorism" since 1984, and therefore is a "terrorist party" within

the meaning of TRIA,[16] and (2) Defendants "are" Iran, and thus are a terrorist

party within the meaning of TRIA. *See In re 650 Fifth Ave. Private Action*, 2014 WL

1516328, at *14. In reaching the latter conclusion, the District Court appears to

have relied on its FSIA analysis, *i.e.*, that Defendants "are" the foreign state of

Iran because they (1) satisfy Executive Order 13,599's definition of "Government

of Iran," (2) satisfy the FSIA's definition of agencies or instrumentalities, and

(3) are alter egos of Iran under *Bancec*. We have already explained why we reject

---

[16] At the time of this writing, three countries fall within the TRIA's definition of "terrorist party" by virtue of having been designated as state sponsors of terrorism: Iran, Sudan, and Syria. *See* U.S. Department of State, State Sponsors of Terrorism, http://www.state.gov/j/ct/list/c14151.htm. South Yemen was removed from the list in 1990, Iraq in 2004, Libya in 2006, North Korea in 2008, and Cuba in 2015.

each of those conclusions.  Accordingly, because Defendants are not themselves a "foreign state designated as a state sponsor of terrorism," for their properties to be subject to TRIA attachment and execution, Defendants must be "agencies or instrumentalities" of Iran under TRIA § 201.

## B. Agencies or Instrumentalities of a Terrorist Party under the TRIA

Section 201(a) of the TRIA confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment. *Weinstein*, 609 F.3d at 50.  As this Court has previously explained, this basis for subject matter jurisdiction derives from the plain language of TRIA § 201(a), which "clearly differentiates between the party that is the subject of the underlying judgment itself, which can be any terrorist party (here, Iran), and parties whose blocked assets are subject to execution or attachment, which can include not only the terrorist party but also 'any agency or instrumentality of that terrorist party.'"  *Id.* at 49.  Thus, the fact that Plaintiffs obtained their underlying judgments against *Iran*, not specifically against *Alavi* or *650 Fifth Ave. Co.*, does not prevent Plaintiffs from attaching Defendants' properties under the

51

TRIA if, *inter alia*, Defendants qualify as agencies or instrumentalities of Iran under the TRIA.

While the FSIA defines "agency or instrumentality,"[17] the TRIA, unfortunately, does not. Defendants argue that because the TRIA is codified as part of the FSIA, the terms "agency or instrumentality" have the same meaning in the TRIA as they do in the FSIA. *See* Appellants Br. 32. The "normal rule of statutory interpretation" is "that identical words used in different parts of the same statute are generally presumed to have the same meaning." *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). But this rule is "not rigid," and "the meaning of identical words well may vary to meet the purposes of the law." *Theodoropoulos v. INS*, 358 F.3d 162, 171 (2d Cir. 2002) (internal quotation marks omitted). Moreover, a statutory provision's placement in a particular section "cannot

---

[17] To reiterate, the FSIA defines "agency or instrumentality" as follows:

> (a) An "agency or instrumentality of a foreign state" means any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

substitute for the operative text of the statute." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008). Indeed, "[n]o accepted canon of statutory interpretation permits 'placement' to trump text, especially where . . . the text is clear and our reading of it is fully supported by the legislative history." *Padilla v. Rumsfeld*, 352 F.3d 695, 721 (2d Cir. 2003), *rev'd on other grounds by Rumsfeld v. Padilla*, 542 U.S. 426 (2004).

Although both the FSIA and the TRIA permit property in the United States held by certain "agencies or instrumentalities" to be attached, under the FSIA the entity must be an "agency or instrumentality of a *foreign state*," 28 U.S.C. § 1603(b) (emphasis added), whereas, under the TRIA, the entity must be an "agency or instrumentality of th[e] *terrorist party*." TRIA § 201(a) (emphasis added). Thus, the text of the TRIA unambiguously reaches more broadly to permit the attachment of property in circumstances not covered by the FSIA or FSIA immunity. *See Weinstein*, 609 F.3d at 50; *see also Rubin v. Islamic Republic of Iran*, 709 F.3d 49, 54 (1st Cir. 2013). Specifically, unlike the FSIA, the TRIA permits attachment and execution against individual "terrorist[s]" and "terrorist organization[s]" (and *their* agencies and instrumentalities). TRIA § 201(d)(4). Individual terrorists and many terrorist organizations encompassed in the

53

TRIA's definition of "terrorist party" are distinguishable from FSIA foreign states and their agencies and instrumentalities in an important respect: they can be *non-state actors*. *See* TRIA § 201(d)(4) (defining "terrorist party" to include "a terrorist," and "a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the [INA] (8 U.S.C. 1182(a)(3)(B)(vi))"); *see also* 8 U.S.C. 1182(a)(3)(B)(vi) (section 212(a)(3)(B)(vi) of the INA, defining "terrorist organization" to encompass non-state terrorist entities); *Ruth Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 867 F. Supp. 2d 389, 394 (S.D.N.Y. 2011) (noting that while "terrorist" is not further defined in TRIA, term has been interpreted to require that individual be "natural person"); *id.* at 394 (observing that Section 212(a)(3)(b)(vi) of the INA "is aimed at non-governmental groups like al Qaeda and Hezbollah, not foreign states").

Precisely because TRIA § 201 encompasses non-state actors and, thus, reaches more broadly than the FSIA, it would contravene a plain reading of the TRIA to cabin its reach by applying the FSIA's definition of agency or instrumentality—which requires a foreign state principal. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (noting that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (alterations and internal quotation marks

omitted)).[18] Thus, we agree with the Eleventh Circuit that "applying the FSIA's definition of agencies or instrumentalities to TRIA would leave only terrorist states as potential sponsors of agencies or instrumentalities under TRIA § 201, eviscerating TRIA's effectiveness vis-à-vis non-state terrorist organizations." *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 731 (11th Cir. 2014). That "cannot stand, as TRIA's definition clearly contemplates nonstate judgment debtors being subjected to TRIA execution." *Id.*

We recognize that where, as here, the alleged terrorist party is a *foreign state* designated as a state sponsor of terrorism, as opposed to an individual terrorist or non-state terrorist organization, applying the FSIA's definition of "agency or instrumentality" to the TRIA might appear less problematic. *See*

---

[18] Though we ordinarily will not look to legislative history when the language of a statute is clear, *see Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992), we note briefly that the history of TRIA § 201 is consistent with our interpretation of the statutory language. Congress enacted TRIA § 201 to "'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties.'" *See Harrison v. Republic of Sudan*, 802 F.3d 399, 407 (2d Cir. 2015) (quoting *Weininger v. Castro*, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006) (quoting H.R. Rep. No. 107–779, at 27 (2002))). Allowing judgment creditors to attach their judgments to the U.S. properties of non-state actors that have carried out terrorist attacks is thus consistent with Congress's comprehensive goals in enacting the TRIA.

TRIA § 201(d)(4).  Just as with non-state terrorist organizations, however, state sponsors of terrorism may operate with less transparency than other sovereign countries, making application of § 1603(b)(3)'s factors unrealistic.  *See Stansell*, 771 F.3d at 732 (noting that state-owned enterprises generally have clear ownership structures "that make[] application of § 1603(b) feasible," while "terrorist organizations . . . operate in the shadows out of necessity," *e.g.*, "a corporation organized under Florida law will almost certainly not list [a terrorist organization] as a shareholder of record" but, rather, "will operate through layers of affiliated individuals and front companies"); Exec. Order 13,599 (explaining additional steps necessary to address Iran's threat to this nation due to "deceptive practices" used by Iran and its banks to "conceal transactions of sanctioned parties"); U.S. Dep't of Treasury, Press Release, Treasury Designates Bank Melli Front Company in New York City, http://www.treasury.gov/press-center/press-releases/Pages/hp1330.aspx (last visited July 8, 2016) (explaining "scheme to use a front company set up by Bank Melli – a known proliferator [of weapons of mass destruction] – to funnel money from the United States to Iran" in violation of sanctions (internal quotation marks omitted)).

Thus, we conclude that § 1603(b) of the FSIA does not apply selectively to foreign states designated as a state sponsor of terrorism under the TRIA. The plain language of the TRIA refers only to "the blocked assets of any agency or instrumentality of that terrorist party," and does not differentiate among the variety of entities that might qualify as a "terrorist party." *See* TRIA §§ 201(a), 201(d)(4). It is against the background of this statutory structure that we determine that Congress did not intend for FSIA § 1603(b) to apply selectively to the TRIA. Thus, because the FSIA definition of "agency or instrumentality"— and specifically the three requirements specified in 28 U.S.C. § 1603(b)—do not pertain to those terms in the TRIA, our conclusion that Defendants cannot be agents or instrumentalities of the "foreign state" of Iran for purposes of FSIA jurisdiction does not foreclose Defendants being agencies or instrumentalities of Iran as a designated terrorist party under the TRIA. Defendants' argument for reversal on this ground fails.

At the same time, however, questions of fact preclude a TRIA award in Plaintiffs' favor as a matter of law. Because the terms "agency or instrumentality" are undefined under the TRIA, we construe these words according to their ordinary meanings. *See, e.g., Taniguchi v. Kan Pac. Saipan, Ltd.,*

57

132 S. Ct. 1997, 2002 (2012); *see also Stansell*, 771 F.3d at 732 (using "plain and ordinary meaning" of "agency" and "instrumentality" in TRIA § 201). We determine the ordinary meaning of these terms in light of the statutory text of the TRIA as a whole. *See Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 868 (2d Cir. 2015) ("[S]tatutory interpretation must begin with the plain language, giving all undefined terms their ordinary meaning while attempting to ascertain how a reasonable reader would understand the statutory text, considered as a whole." (alterations and internal quotation marks omitted)).

"Instrumentality" is a means through which a function of another entity is accomplished, analogous to a branch of a governing body. *See Black's Law Dictionary* (10th ed. 2014) (defining "instrumentality" as "a means or [a]gency through which a function of another entity is accomplished, such as a branch of a governing body"); *Webster's Third New International Dictionary* 1172 (1993) (defining instrumentality as "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out: a part, organ, or subsidiary branch esp. of a governing body"); *OED Online*, *Oxford University Press*, June 2016 (defining instrumentality as "[t]hat which serves or is employed for some purpose or end; a means, an agency"); *Merriam–Webster*

58

*Collegiate Dictionary* 22 (10th ed. 1993) (defining instrumentality as a "means" or an "agency").

"Agency" is an entity acting on another's behalf or providing a particular service on another's behalf.  *See OED Online, Oxford University Press*, June 2016 (defining agency as "[a] person or organization acting on behalf of another, or providing a particular service"); *Webster's Third New International Dictionary* 1172 (1993) (defining agency as "a person or thing through which power is exerted or an end is achieved"); *Merriam–Webster Collegiate Dictionary* 22 (10th ed. 1993) (defining agency as "a person or thing through which power is exerted or achieved").  As ordinarily understood, an entity that is an "agency" or an "instrumentality" is distinct from, even if a part of, the entity for which the agency or instrumentality is acting.

To demonstrate that Defendants are "agencies or instrumentalities" of a terrorist party under the TRIA, therefore, Plaintiffs must show that each Defendant (1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the

59

terrorist party.[19] *See Stansell*, 771 F.3d at 723 (explaining that party seeking to execute against assets of terrorist party's agency or instrumentality under TRIA "must . . . establish that the purported agency or instrumentality is actually an agency or instrumentality").  Neither in the District Court nor before this Court have the parties addressed whether, to satisfy the TRIA's definition of agency or instrumentality, Plaintiffs must here show that Defendants knew, or reasonably should have known, that they were functioning for, providing material services on behalf of, or being owned, controlled, or directed by the terrorist party (here, Iran).  Nor have they addressed whether an innocent-owner-type defense would be available to a terrorist's agency or instrumentality.  *Cf.* 18 U.S.C. § 983(d) (providing for innocent-owner defense to civil forfeiture where third-party claimant proves by preponderance of evidence that he "(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the

---

[19] *Cf. Stansell*, 771 F.3d at 724 n.6, 732 (adopting the district court's "plain and ordinary meaning" of "agency" and "instrumentality" in TRIA § 201, where the district court stated that it meant, *inter alia*, (1) an entity that "materially assist[ed] in, or provid[ed] financial or technological support for or to, or provid[ed] goods or services in support of" the terrorist party at issue in that case "and/or" (2) an entity "owned, controlled, or directed by, or acting for or on behalf of" the terrorist party at issue in that case).

60

circumstances to terminate such use of the property"). We do not decide these questions here, leaving them for further consideration on remand. We note only that whether Defendants satisfied any one of the identified aspects of agency or instrumentality is a disputed question of fact in this case. Although the record demonstrates as a matter of law that Bank Melli owned and controlled Assa even after 1995, such that Alavi was providing services to Bank Melli (and, therefore, Iran) through the time of the filing of the civil forfeiture complaint, questions of fact persist as to whether Alavi did so with knowledge. *See In re 650 Fifth Ave.*, 14-2027, at 56–59.[20]

Further, insofar as Plaintiffs contend that Alavi itself was sufficiently owned, controlled, or directed by Iran to render it an agency or instrumentality of a terrorist party under the TRIA, questions of fact exist as to whether Alavi was so owned, controlled, or directed at the time Plaintiffs' complaints were

---

[20] We here refer only to Alavi's knowledge because if Alavi had such knowledge, it would be imputed to 650 Fifth Ave. Co., of which Alavi owns 60%. *See* N.Y. Partnership Law § 23 ("Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.").

61

filed. *See Dole Food Co.*, 538 U.S. at 480. Although there is record evidence that Iran created Alavi in 1973, supervised its Board in the 1980s and 1990s, and controlled its affairs to a certain extent around that same time, the only recent record evidence of Iran's control is a 2007 meeting between Alavi board members, Alavi's then-President Farshid Jahedi, and Iran's Ambassador to the United Nations, Mohammad Khazaee, at which Plaintiffs contend Khazaee instructed Jahedi with respect to Alavi's management. A set of notes dated October 5, 2007, purportedly from that meeting, however, are too ambiguous to support a matter-of-law conclusion that Iran controlled Alavi at that time. *See In re 650 Fifth Ave.*, 14-2027, at 27–28 (explaining that authorship of notes is unknown and speaker referenced therein is unclear). Moreover, in urging that Iran does not control Alavi, Defendants highlight, among other things, the testimony of Abbas Mirakhor, an Alavi board member from 1991 through 2005, who maintained that Alavi's decisions were made by its Board and President without interference by Iran, *see* App'x 5705–07; the declaration of Hanieh Safakamal, Alavi's financial manager since April 2000, who stated that Alavi managed its own assets and chose its own employees, *see* App'x at 6565–66; and the declaration of Ali Aliabadi, Alavi's program coordinator since 2005, who

62

confirmed the lack of Iran's participation in Alavi's affairs, *see* App'x 6652–53.

Viewing this evidence in the light most favorable to Defendants as we must on

summary judgment review, *see Cortes*, 802 F.3d at 228, we conclude that

questions of fact as to the extent of Iran's control over Alavi at the relevant time

require vacatur of the District Court's judgment in Plaintiffs' favor. This

conclusion is not inconsistent with our matter-of-law determination that

Defendants are not the alter egos of Iran, *see supra* at 41–47, because "[t]he level

of state control required to establish an 'alter ego' relationship is more extensive

than that required to establish . . . 'agency,'" *U.S. Fid. & Guar. Co. v. Braspetro Oil

Servs.*, 1999 WL 307666, at \*7 (quoting *Walter Fuller Aircraft Sales, Inc. v. Republic of

the Philippines*, 965 F.2d 1375, 1381 (5th Cir. 1992)).

### C. Blocked Assets

To attach Defendants' properties under the TRIA, Plaintiffs must also

show that the Defendants' properties are "blocked assets." *See* TRIA § 201(a).

The TRIA defines "blocked asset" as "any asset seized or frozen by the United

States under section 5(b) of the Trading With the Enemy Act [("TWEA")] (50

U.S.C. App. 5(b)) or under sections 202 and 203 of the [IEEPA] (50 U.S.C. 1701;

1702)." TRIA § 201(d)(2)(A). Both blocking regimes "authorize the President to

63

freeze the assets of foreign enemy states and their agencies and instrumentalities" in order to "put control of foreign assets in the hands of the President so that he may dispose of them in the manner that best furthers the United States' foreign-relations and national-security interests." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1318 (2016) (alterations and internal quotation marks omitted).

Defendants argue that their assets are not blocked as required for TRIA attachment because Defendants have not been added to the SDN List and the United States does not have a possessory interest in their assets.[21] For the reasons set forth herein, we conclude that (1) all assets belonging to an entity that satisfies Executive Order 13,599's definition of "Government of Iran" are automatically blocked, regardless of whether that entity is on the SDN or Executive Order 13,599 List, but (2) whether Defendants satisfy that definition depends on the resolution of disputed questions of material fact.

First, the relevant Executive Order and implementing ITRs undermine the

---

[21] As discussed *supra* at 21–23, after briefing was completed and we heard oral argument in this case, OFAC began publishing the Executive Order 13,599 List to aid in its identification of persons satisfying that Order's definition of "Government of Iran." Accordingly, we here consider whether inclusion on that list or the SDN List is required for an entity's assets to be blocked for TRIA attachment.

argument that an entity's assets qualify as "blocked assets" only if that entity is on the SDN List or Executive Order 13,599 List. As discussed *supra*, in Executive Order 13,599, President Obama ordered that, under the authority conferred on him by the IEEPA, "[a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States . . . *are blocked* and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." Exec. Order 13,599 (emphasis added); *see* 31 C.F.R. § 560.211 (implementing blocking order).[22] As set forth in the OFAC regulation implementing Executive Order 13,599, "[t]he property and interests in property of persons falling within the definition of the terms Government of Iran and Iranian financial institution are blocked pursuant to this section *regardless of whether the names of such persons are published in the Federal Register or incorporated into the E.O. 13599 List or the SDN List*." 31 C.F.R. § 560.211, Note 1 (2016)

---

[22] The parties do not dispute the President's IEEPA authority to block such property. *See* 50 U.S.C. § 1702(a)(1)(B) (stating that where President has declared a national emergency to deal with an unusual and extraordinary threat under § 1701 he may, among other things, "investigate, block during the pendency of an investigation, regulate, . . . prevent or prohibit, any . . . use [or] transfer . . . of . . . any property in which any foreign country or a national thereof has any interest"); *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1318 (2016) (explaining that IEEPA "authorize[s] the President to freeze the assets of 'foreign enemy state[s]' and their agencies and instrumentalities").

(emphasis added); *id.* § 560.304, Note 1 (2016) (same); *see also* U.S. Dep't of Treasury, *OFAC FAQs: Iran Sanctions*, www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_iran.aspx (last visited July 10, 2016) (stating that "[Executive Order 13,599] blocks the property and interests in property of any individual or entity that comes within its definition of the term 'Government of Iran' *regardless of whether it is listed on the SDN List*" (emphasis added)); *id.* (explaining that Executive Order 13,599 "similarly . . . blocks the property and interests in property of all Iranian financial institutions as defined in the order *regardless of whether the Iranian financial institution is listed on the SDN List*" (emphasis added)). Indeed, in removing various entities, including Bank Melli and Assa, from the SDN List pursuant to the JCPOA, *see supra* at 22–23, the Treasury Department made clear that, "even after Implementation Day, individuals and entities meeting the definition of the Government of Iran or an Iranian financial institution, . . . remain persons whose property and interests in property are blocked pursuant to" Executive Order 13,599 and § 560.211. *JCPOA Guidance* at 28. Although certain entities, including Bank Melli, that satisfy the definition of Government of Iran have since been added to the Executive Order 13,599 List, that list is not exhaustive, *see* 31 C.F.R. § 560.211, Note 1, and "U.S.

66

persons . . . continue to have an obligation to block the property and interests in property of all individuals and entities that meet the definition of the Government of Iran or an Iranian financial institution, regardless of whether the individual or entity has been previously identified by OFAC as meeting those definitions," *JCPOA Guidance* at 28.

The Supreme Court's recent decision in *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016), supports the conclusion that Executive Order 13,599 blocks the U.S. property of any entity falling within the ambit of that order, without regard to whether the property holder has been added to the SDN List or Executive Order 13,599 List. In explaining that the Central Bank of Iran's properties are "blocked assets" under the TRIA, the Court did not rely on the bank's SDN status or its inclusion on the Executive Order 13,599 List but, rather, explained that the President invoked his IEEPA authority in Executive Order 13,599 and "block[ed] '[a]ll property and interests in property of any Iranian financial institution, including the Central Bank of Iran, that are in the United States.'" 136 S. Ct. at 1318 (quoting Exec. Order 13,599); *see also id.* at 1320 n.10 (explaining that Executive Order 13,599 "blocked the assets and thereby opened the door to execution under the TRIA"). *Bank Markazi* further explained that "[t]o place

beyond dispute the availability of some of the Executive Order No. 13599-

blocked assets for satisfaction of judgments . . . , Congress passed" a separate

statute. *Id.*

Given that Executive Order 13,599 blocks all U.S. property of "the

Government of Iran, including the Central Bank of Iran," the Supreme Court's

explanation also pertains to entities satisfying the definition of the "Government

of Iran." Moreover, the Court's reference to "Executive Order No. 13599-blocked

assets" evinces its understanding of Executive Order 13,599 as in and of itself

blocking assets for purposes of the TRIA. *See id.*[23] The Ninth Circuit has

similarly treated Executive Order 13,599 as sufficient to block Iranian-owned

assets regardless of an entity's SDN status or inclusion on the Executive Order

13,599 List. *See Bennett v. Islamic Republic of Iran*, No. 13-15442, 2016 WL 3257780,

---

[23] Although on appeal Bank Markazi did not dispute that its assets were blocked, *see Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 188 (2d Cir. 2014) (explaining that Bank Markazi conceded that § 8772's statutory elements were satisfied, which included requirement that assets were blocked), the district court there, relying on OFAC guidance, explained that the SDN list "purports to be neither exhaustive nor exclusive," and could not "be used as a sole reference point in connection with a determination as to whether a particular entity's assets are in fact 'blocked' pursuant to" Executive Order 13,599, *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518(KBF), 2013 WL 1155576, at *9 (S.D.N.Y. Mar. 13, 2013). Rather, the district court there explained, so long as an entity satisfies the definition of "Government of Iran," its assets are blocked under that Executive Order. *See id.*

at *4 (9th Cir. June 14, 2016) (stating that, in addition to Bank Melli's assets being blocked as a result of October 25, 2007 SDN listing, those assets "also are blocked pursuant to [Executive Order 13,599] blocking the property of Iran and Iranian financial institutions"). Accordingly, if Defendants satisfy Executive Order 13,599's definition of Government of Iran, their assets are automatically blocked pursuant to that Order regardless of whether they are on the SDN List or Executive Order 13,599 List.

Nor are we persuaded by Defendants' argument that, even assuming Executive Order 13,599 blocks all property belonging to the "Government of Iran," that does not render that property blocked within the meaning of TRIA because it is not "seized or frozen by the United States" pursuant to the IEEPA. In so arguing, Defendants rely on *Smith v. Federal Reserve Bank of New York*, 346 F.3d 264 (2d Cir. 2003), in which we explained that, for purposes of the TRIA, "[t]o seize or freeze assets transfers *possessory* interest in the property." *Id.* at 272 (emphasis in original).

As an initial matter, we agree with Defendants that the District Court erred in concluding that Defendants' assets were "seized or frozen" within the meaning of the TRIA because "the Court-appointed Monitor and Interim

Trustee," who has control over Defendants' properties, had obtained a "possessory interest" in those properties. *In re 650 Fifth Ave. Private Action*, 2014 WL 1516328, at *15. As relevant here, the plain text of the TRIA permits attachment of assets "seized or frozen by the United States . . . under sections 202 and 203 of the [IEEPA]." TRIA § 201(d)(2)(A). It does not "reach those funds which the government has been given authorization to control through another means." *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 685 (5th Cir. 2013).[24] Any control the court-appointed monitor has over Defendants' properties, therefore, is insufficient to render them blocked for purposes of the TRIA.

We nevertheless conclude that, pursuant to Executive Order 13,599, the United States has acquired a "possessory interest" in Defendants' properties. That Order prohibits transferring or otherwise dealing in property within the

---

[24] We note that Defendants do not here argue that, assuming their assets were automatically blocked pursuant to Executive Order 13,599, subsequent actions taken in the related forfeiture action, *see In re 650 Fifth Ave. Co.*, 14-2027, effectively unblocked them. *Cf. United States v. Holy Land Foundation for Relief & Dev.*, 722 F.3d 677, 685–87 (5th Cir. 2013) (concluding that judgment creditors could not attach Holy Land's previously blocked assets under TRIA because assets were unblocked as a result of the government's procurement of OFAC license authorizing it to pursue criminal forfeiture against those assets, as well as restraining orders to preserve them).

United States that belongs to the "Government of Iran" as defined therein, and further authorizes the Secretary of the Treasury to promulgate necessary regulations to carry out those prohibitions, *see* Exec. Order 13,599, thus providing the government with sufficient control of such property to be recognized as a possessory interest, *see* Black's Law Dictionary 1284 (9th ed. 2009) (defining "possessory interest" as "right to control property, including the right to exclude others, by a person who is not necessarily the owner"). *Smith*, 346 F.3d at 271–72, supports this conclusion. In *Smith*, we concluded that certain judgment creditors could not rely on the TRIA to attach previously blocked Iraqi assets because they were no longer "blocked assets" due to President George W. Bush's March 20, 2003 confiscation order. *See id.* at 271–72. The Iraqi assets at issue were "froze[n]" when President George H.W. Bush issued Executive Order 12,722, which ordered that "'[a]ll property and interests in property of the Government of Iraq . . . are hereby blocked,'" *id.* at 268 (quoting Exec. Order No. 12,722, 55 Fed. Reg. 31803 (Aug. 2, 1990)). The assets were then confiscated pursuant to President George W. Bush's March 20, 2003 confiscation order, which "confiscated and vested in the Department of the Treasury" "[a]ll blocked funds held in the United States in accounts in the name of the Government of Iraq,"

71

Exec. Order No. 13,290, 68 Fed. Reg. 14306, 14307 (Mar. 20, 2003). Viewed in this

context, *Smith*'s statement that there was "no dispute that the Iraqi Assets at

issue were 'blocked funds' within the meaning of TRIA § 201(a) at the time the

President issued the confiscation Order," 346 F.3d at 269, is properly understood

to mean that, pursuant to Executive Order 12,722, the assets were blocked until a

President ordered their confiscation, not that blocking was *effected* by the

confiscation order. *Smith* thus supports the conclusion that Executive Order

13,599, which uses blocking language similar to Executive Order 12,722, freezes

all U.S. property belonging to the Government of Iran.[25]

Indeed, the absence of a confiscation order here helps, rather than hurts,

Plaintiffs' attempt to attach Defendants' properties under the TRIA. In

concluding in *Smith* that TRIA's reference to "blocked assets" did not include

confiscated assets, we distinguished seizing or freezing assets—which "transfers

*possessory* interest in the property"—with confiscating assets—which "transfers

*ownership* of terrorist property by vesting right, title, and interest as the President

---

[25] *See* Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012) (stating that "[a]ll property and interests in property of the Government of Iran . . . that are in the United States . . . are blocked"); Exec. Order No. 12,722, 55 Fed. Reg. 31803 (Aug. 2, 1990) (stating that "[a]ll property and interests in property of the Government of Iraq . . . that are in the United States . . . are hereby blocked").

deems appropriate." 346 F.3d at 272 (emphasis in original) (discussing legislative history in which Senator Harkin stated that "assets as to which the United States claims ownership are not included in the definition of 'blocked assets'" (quoting 148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (other internal quotation marks omitted)). The IEEPA permits confiscation only "when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals," and the President "determines" that the "foreign person, foreign organization, or foreign country" whose property is being confiscated "planned, authorized, aided, or engaged in such hostilities or attacks against the United States." 50 U.S.C. § 1702(a)(1)(C). The confiscation order in *Smith* followed the President's "determin[ation] that the United States and Iraq are engaged in armed hostilities." Exec. Order No. 13,290, 68 Fed. Reg. 14306, 14307 (Mar. 20, 2003). The lack of a confiscation order here signals only that the President has made no such determination with respect to Iran—not that the United States lacks a possessory interest in U.S. property belonging to the Government of Iran.

Accordingly, because (1) President Obama specifically invoked his IEEPA authority in issuing Executive Order 13,599, and (2) that Order seizes or freezes

the U.S. property of any entity satisfying the definition of "Government of Iran,"

(3) regardless of whether that entity is included on the SDN List or Executive

Order 13,599 List, if Defendants satisfy Executive Order 13,599's definition of

"Government of Iran," their assets are blocked and, therefore, subject to

attachment under TRIA § 201. Nevertheless, for the same reasons we concluded

that disputed questions of material fact preclude determining as a matter of law

whether Defendants are agencies or instrumentalities under the TRIA, *see supra*

at 59–63, we cannot determine as a matter of law that Defendants satisfy the

definition of "Government of Iran," *i.e.*, that they are a "political subdivision,

agency, or instrumentality thereof, including . . . any person owned or controlled

by, or acting for or on behalf of, the Government of Iran," Exec. Order 13,599.[26]

We therefore remand for further proceedings to resolve these factual disputes.

---

[26] We note that if Alavi satisfies this definition, the assets of 650 Fifth Ave. Co., of which Alavi owns 60%, are also blocked. *See* 31 C.F.R. § 560.425 (stating that, if person whose assets are blocked pursuant to § 560.211 has at least 50% interest in entity, that entity is also blocked "regardless of whether the entity itself is designated pursuant to § 560.211").

74

**CONCLUSION**

To summarize, we conclude as follows:

1.  As to summary judgment ordering turnover of Defendants' property under the FSIA,

    (a)   Defendants do not qualify, as a matter of law, as the foreign state of Iran such that Defendants' properties may be turned over to help satisfy Plaintiffs' judgments under the FSIA, *see* 28 U.S.C. § 1603(a);

    (b)   Defendants do not qualify, as a matter of law, as the agencies or instrumentalities of the foreign state of Iran such that Defendants' properties may be turned over to help satisfy Plaintiffs' judgments under the FSIA, *see* 28 U.S.C. § 1603(b);

    (c)   Defendants do not quality as the alter egos of Iran under *Bancec*, 462 U.S. at 627, such that Defendants' properties may be turned over to help satisfy Plaintiffs' judgments under the FSIA.

2.  As to summary judgment ordering turnover of Defendants' property under the TRIA,

(a)     Defendants do not qualify, as a matter of law, as Iran in its

capacity as a "foreign state designated as a state sponsor of

terrorism" under the TRIA, *see* TRIA §§ 201(a), 201(d)(4), but

(b)     (i) Defendants' status as "agencies or instrumentalities" of Iran

under the TRIA, *see* TRIA § 201(a); *supra* 59–61 and (ii)

Defendants' properties status as "blocked assets" under that

statute, *see* TRIA § 201(d)(2)(A), is not foreclosed as a matter of

law.  However, we identify questions of fact that prevent either

of these TRIA questions from being decided on summary

judgment.

Accordingly, the only issues returning to the District Court for further

proceedings are (1) Defendants' status as agencies or instrumentalities under the

TRIA, and (2) whether their asserts are "blocked" under that statute.  For the

foregoing reasons, the judgment of the District Court is VACATED and

REMANDED for further proceedings consistent with this order.